UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal No. 19-cr-00013-WMW-DTS |
| | ) | |
| BRETT PALKOWITSCH, | ) | Hon. Wilhelmina M. Wright |
| Defendant. | ) | United States District Judge |

## GOVERNMENT'S POSITION ON SENTENCING

The United States of America, by and through the undersigned attorneys, hereby submits its position on the sentencing of Defendant Brett Palkowitsch, which is scheduled for April 4, 2020. The United States respectfully asks the Court to adopt the factual findings and advisory Guidelines calculations in the final pre-sentence report, and to sentence Defendant Palkowitsch to 87 months of imprisonment, the low end of his Guideline range. A Guideline sentence of 87 months of imprisonment is sufficient, but not greater than necessary, to promote the purposes of sentencing, 18 U.S.C. § 3553, because it would appropriately account for (1) the seriousness of civil rights violations; (2) the aggravating factors that make Defendant Palkowitsch's civil rights violation particularly serious; (3) the special need for general deterrence in this context; and (4) the interest in promoting sentence uniformity.

## I.   PROCEDURAL HISTORY

The Indictment charged Brett Palkowitsch, a St. Paul police officer, with a single count of depriving arrestee F.B. of his Fourth Amendment right to be free from unreasonable force by a police officer, in violation of 18 U.S.C. § 242. (Doc. No. 1). The Indictment alleged, more specifically, that the Defendant "repeatedly kicked F.B. while F.B. was on the ground and a police canine was biting F.B."; that the offense "involved the use of a dangerous weapon" (the

Defendant's shod foot); and that Defendant's kicks "resulted in bodily injury to F.B." (several broken ribs and two collapsed lungs). Id.  On November 26, 2019, after a nine-day trial, the jury returned a guilty verdict. (Doc. No. 100).

The Court set a sentencing date of April 4, 2020. (Doc. No. 113).  The Probation Department conducted a pre-sentence investigation, filed a preliminary pre-sentence report ("Preliminary PSR") on January 9, 2020, and gave notice to the parties that any objections would be due by January 23, 2020. (Doc. Nos. 117, 118).  The United States filed a response stating that the United States agreed with the Preliminary PSR's proposed factual findings and Guidelines calculations. (Doc. No. 120).  Defendant Palkowitsch sent a 12-page letter response to the Probation Department lodging several objections to the Preliminary PSR's proposed factual findings and Guidelines calculations. See Exhibit A.  On February 12, 2020, the Probation Department filed the final pre-sentence report ("PSR") and issued a notice stating that pleadings setting forth the parties' respective positions regarding sentencing are due by February 26, 2020.

## II.   OFFENSE CONDUCT

The United States incorporates by reference the summary of offense conduct in the PSR. Doc. No. 125, ¶¶ 4–15.  The United States respectfully requests that the Court adopt the factual findings set forth in that summary.

The United States disagrees with Defendant Palkowitsch's objections to the Preliminary PSR's summary of offense conduct, see Exhibit A, and agrees with the Probation Department's response that, "The Court presided over the trial and is in the best position to assess the accuracy and objectivity of the Offense Conduct in the report." (Doc. No. 125 at A.5).  At sentencing, the United States will be prepared to address Defendant Palkowitsch's proposed deletions, additions, and other edits—none of which affects his Guideline range—if the Court deems it necessary.

2

III.   **SENTENCING GUIDELINES CALCULATION**

The table below reflects the Probation Department's Guidelines calculations for Defendant Palkowitsch's sentence.

| § 2H1.1(a)(1)→ § 2A2.2(a) | Base Offense Level | 14 |
|---|---|---|
| § 2A2.2(b)(2)(B) | Use of a Dangerous Weapon | + 4 |
| § 2A2.2(b)(3)(B) | Victim Sustained Serious Bodily Injury | + 5 |
| § 2H1.1(b)(1) | Committed Under Color of Law | + 6 |
| | Total Offense Level | 29 |
| § 4A1.1 | Criminal History Category | I |
| | Guideline Range | 87–108 months |

The United States agrees, in every respect, with the Probation Department's calculation of Defendant Palkowitsch's Guideline range.  It is the same calculation the undersigned prosecutors provided to defense counsel, nine months before trial, for the purpose of plea negotiations.  See Exhibit B (email to defense counsel, dated February 1, 2019, stating, in pertinent part: "Attached is a chart reflecting that, according to our calculations, your client's Guidelines range if he were convicted after trial would be 87–108 months of imprisonment.").

In his letter responding to the Preliminary PSR, Defendant Palkowitsch objects to the Probation Department's calculation of his Guideline range on five grounds.  He argues: (1) that Defendant Palkowitsch "qualifies for and should receive" a two-level acceptance-of-responsibility adjustment, under U.S.S.G. § 4E1.1(a); (2) that applying the cross-reference to § 2A2.2, the guideline for aggravated assault, is "misguided" and violates the rule of lenity; (3) that applying specific offense characteristics from § 2A2.2 and § 2H1.1 "amounts to double counting"; (4) that a four-level increase for moderate bodily injury, rather than a five-level increase for serious bodily injury, should be applied; and (5) that the dangerous weapon enhancement is unwarranted.  See Exhibit A.

3

For the following reasons, each of those objections should be overruled.

First, the acceptance-of-responsibility adjustment would be inappropriate in this case (1) because that "adjustment is not intended to apply to a defendant," like Defendant Palkowitsch, "who puts the government to its burden of proof at trial by denying the essential factual elements of guilt [and] is convicted" after a trial;  (2) because this case is not one of the "rare exceptions" to that rule in which a defendant acknowledges his factual guilt but proceeds to trial in order to preserve a legal challenge; and (3) because, although Defendant Palkowitsch has admitted to kicking Mr. Baker, he has never admitted to intentionally using excessive force against Mr. Baker, his true offense conduct. U.S.S.G. § 3E1.1 application notes.  For each of these reasons, Defendant Palkowitsch is ineligible for an acceptance-of-responsibility adjustment.

Second, the application of § 2H1.1(a)(1)'s cross-reference to § 2A2.2, the guideline for aggravated assault, is appropriate (1) because Defendant Palkowitsch's offense conduct—kicking Mr. Baker three times in the ribs with his shod foot, resulting in seven broken ribs and two collapsed lungs—straightforwardly fits within the Guidelines definition of "aggravated assault": it was "a felonious assault that involved . . . serious bodily injury," U.S.S.G. § 2A2.2 application notes; and (2) because the "plain language of § 2H1.1 directs a court to apply the sentencing guideline applicable to the underlying offense (here, aggravated assault) if it would produce a greater base offense level than the base offense level premised solely on § 2H1.1," United States v. Cozzi, 613 F.3d 725, 733 (7th Cir. 2010).  The Eighth Circuit has upheld the application of the aggravated assault cross-reference in two excessive force prosecutions like this one. See United States v. Boone, 110 F. Supp. 3d 909, 916 (S.D. Iowa 2015), aff'd 828 F.3d 705 (8th Cir. 2016); United States v. Dautovic, 763 F.3d 927, 932 (8th Cir. 2014).  Because there is no ambiguity,

much less "grievous ambiguity or uncertainty," the rule of lenity does not apply. <u>United States v.</u> <u>Golden</u>, 669 F.3d 901, 903 (8th Cir. 2012).

Third, the application of specific-offense characteristics from both sections—specifically, the § 2A2.2 enhancements for "serious bodily injury" and use of a "dangerous weapon," and the § 2H1.1 "public official/color of law" enhancement—is the proper interpretation of the Guidelines and does not result in double counting. The plain language of § 2H1.1(a)(1)'s cross-reference directs a court to apply "the offense level"—not the *base offense level*—"from the offense guideline applicable to any underlying offense." Confirming that interpretation, the Guidelines provision entitled, "Interpretation of References to Other Offense Guidelines," provides: "An instruction to use the offense level from another offense guideline refers to the offense level from the entire offense guideline (i.e., the base offense level, specific offense characteristics, cross references, and special instructions)." U.S.S.G. § 1B1.5(b)(1). In this case, the applicable offense guideline is aggravated assault, for the reasons already stated, and the offense level for that guideline is calculated by adding the base offense level (14) to the applicable specific offense characteristics (+4 for dangerous weapon and +5 for serious bodily injury). The resulting number (23) is then added to § 2H1.1's specific offense characteristic (+6 for public official/color of law) to arrive at a total offense level of 29. The district courts in <u>Boone</u> and <u>Dautovic</u>—the Eighth Circuit excessive force prosecutions referenced in the preceding paragraph—applied specific offense characteristics from both sections, and, in both cases, the Eighth Circuit found no error in the Guidelines calculations. <u>See Boone</u>, 110 F. Supp. 3d at 916, <u>aff'd</u> 828 F.3d 705; <u>Dautovic</u>, 763 F.3d at 932.

Fourth, a five-level enhancement for "serious bodily injury" is warranted, under § 2A2.2(b)(3)(B), because the injuries that Defendant Palkowitsch inflicted on Mr. Baker—seven

broken ribs and two collapsed lungs—satisfy each of the alternative definitions of "serious bodily injury" under the Guidelines. As Mr. Baker and Dr. Nelson testified, those injuries (1) caused Mr. Baker "extreme physical pain"; (2) resulted in "the protracted impairment of a function of a bodily . . . organ" (his lungs, which remain impaired to this day); and (3) "require[ed] medical intervention such as surgery" (the bilateral chest tube thoracostomies) and "hospitalization" at Regions Hospital. U.S.S.G. § 1B1.1 application notes (defining "serious bodily injury"). For those reasons, Mr. Baker's injuries satisfy the Guidelines definition of "serious bodily injury." United States v. Wilson, 686 F.3d 868, 869, 873–74 (8th Cir. 2012) (affirming application of the "serious bodily injury" enhancement, in the context of an excessive force prosecution, where the victim suffered a fractured bone in addition to cuts and bruises).

Fifth, a four-level enhancement for use of a dangerous weapon is warranted, under § 2A2.2(b)(2)(B), (1) because Defendant Palkowitsch acknowledged on cross-examination that he was wearing boots when he kicked Mr. Baker three times in the ribs; (2) because boots meet the Guidelines definition of "dangerous weapon," as they are "capable of inflicting death or serious bodily injury" if used kick someone; and (3) because the case law makes clear that where, as here, a defendant kicks a victim while wearing boots, the "dangerous weapon" enhancement applies. See United States v. Dunnaway, 88 F.3d 617, 619 (8th Cir. 1996) (affirming district court's application of dangerous weapon enhancement, under § 2A2.2(b)(2)(B), on the basis that the defendants used "their boots as dangerous weapons during the assault"); United States v. Serrata, 425 F.3d 886, 910 (10th Cir. 2005) (ruling, in § 242 prosecution for excessive force, that "the district court correctly considered the [defendant's] boots to be dangerous weapons" under § 2A2.2(b)(2)(B)); United States v. Hickman, 766 F. App'x 240, 247 (6th Cir. 2019) (unpublished) (ruling, in § 242 prosecution for excessive force, that defendant-officer's "boot was a dangerous

6

weapon for purposes of the four-level enhancement under § 2A2.2(b)(2)(B)"); United States v. Velasco, 855 F.3d 691, 694 (5th Cir. 2017) (affirming district court's judgment that "the shoes Velasco used to 'stomp' [the victim's] head against the 'solid prison floor'" qualified as "dangerous weapons" under § 2A2.2(b)(2)(B)); United States v. Villela-Alberto, 285 F. App'x 98, 101 (4th Cir. 2008) (affirming district court's judgment that the defendant's "prison-issued hard-toed boots," which he used to kick the victim, qualified as "dangerous weapons" under § 2A2.2(b)(2)(B)).

For the foregoing reasons, this Court should reject Defendant Palkowitsch's five objections and should adopt the PSR's Guidelines calculations, which result in a Guideline range of 87 to 108 months of imprisonment.

## IV.   GOVERNMENT'S SENTENCING RECOMMENDATION

The United States respectfully submits that a Guideline sentence of 87 months of imprisonment, the low end of Defendant Palkowitsch's Guideline range, is sufficient, but not greater than necessary, to promote the purposes of sentencing. 18 U.S.C. § 3553.  Specifically, a Guideline sentence of 87 months of imprisonment would appropriately account for (1) the seriousness of civil rights violations; (2) the aggravating factors that make Defendant Palkowitsch's civil rights violation particularly serious; (3) the special need for general deterrence in this context; and (4) the interest in promoting sentence uniformity.

First, a Guideline sentence of 87 months of imprisonment would "make explicit that the excessive use of force by law enforcement is a serious civil rights violation that simply will not be tolerated." United States v. Boone, 110 F. Supp. 3d 909, 919 (S.D. Iowa 2015), aff'd 828 F.3d 705 (8th Cir. 2015).  As the Supreme Court has emphasized, "Public officials convicted of violating § 242 have done more than engage in serious criminal conduct; they have done so under color of the law they have sworn to uphold." Koon v. United States, 518 U.S. 81 (1996).  "The seriousness

of section 242 crimes simply cannot be understated, as they harm far more than individual victims; society as a whole is harmed when those entrusted to protect the public and enforce the laws turn to lawlessness themselves." Id. at 917; see also United States v. Rodella, No. CR 14-2783 JB, 2015 WL 711941, at *50 (D.N.M. Feb. 5, 2015) (unpublished) ("A law enforcement officer's violation of the law is not comparable to an ordinary criminal's violation. Civil rights crimes go to the core of our system and endanger the entire structure of our government and are a threat to the republic.").   If civil rights crimes are not taken seriously and punished appropriately, disproportionally affected groups are left with the impression that their rights do not matter and that law enforcement officers will continue to violate their rights with impunity.

Second, a Guideline sentence of 87 months of imprisonment would account for the aggravating factors that make Defendant Palkowitsch's civil rights violation particularly serious:

- Severity of injuries.  Defendant Palkowitsch inflicted serious injuries to Frank Baker—seven broken ribs and two collapsed lungs—injuries that, as the treating physician testified, were potentially fatal, and injuries that, as Mr. Baker testified, still bother him to this day. That is an aggravating factor the Court should consider in imposing sentence. See United States v. Dautovic, 763 F.3d 927, 935 (8th Cir. 2014) (noting that the officer's "infliction of serious injury" was an "aggravating factor" the district court did not appropriately factor into the officer's sentence).

- Bragging.  Defendant Palkowitsch bragged to other officers about inflicting those injuries. When he returned to the police station, officers heard him brag that his third kick, "got that fucker good" and that he could hear Mr. Baker's ribs break.  Defendant Palkowitsch continued to brag about his use of force even after Officers Spencer and Dick confronted him about the severity of Mr. Baker's injuries.  Later that evening, Defendant Palkowitsch texted Officer Rachelle Erickson a photograph of Mr. Baker lying on a hospital bed, and boasted to her that he had broken Mr. Baker's ribs.  That Defendant Palkowitsch was proud of his actions and bragged openly about seriously injuring an innocent man is an aggravating factor the Court should consider in imposing sentence. See United States v. Smith, 860 F.3d 508, 516 (7th Cir. 2017) (overturning district court's below-Guidelines sentence for police officer convicted of excessive force, reasoning that the sentence failed to account for several aggravating factors, including that the defendant-officer "bragged about his behavior and mocked his fellow officers when they questioned his actions").

8

- <u>Obstruction</u>.  It is the position of the United States that Defendant Palkowitsch attempted to cover up his use of excessive force by lying in an official police report and by doubling down on those lies during his sworn testimony at trial.  The specific false statements and material omissions were addressed in detail at trial during Defendant Palkowitsch's cross examination as well as during closing argument.   Although a two-level obstruction enhancement under U.S.S.G. § 3C1.1 arguably would be justified under the circumstances, the United States is not asking the Court to impose that enhancement, which would increase Defendant Palkowitsch's Guideline range to 108–135 months of imprisonment; rather, the United States respectfully submits that the Court should consider Defendant Palkowitsch's false statements and false testimony as another reason to impose a Guideline sentence. <u>United States v. Felicianosoto</u>, 934 F.3d 783, 788 (8th Cir. 2019) (noting that "the district court identified several factors that led it to apply a sentence at the top of the Guidelines range, including Felicianosoto's perjurious statements and his refusal to accept responsibility for his offenses," and explaining that "[t]hese are permissible factors for the court to consider when imposing a sentence").

- <u>Collateral damage</u>.  Defendant Palkowitsch's use of excessive force inflicted considerable damage beyond Frank Baker's broken ribs and collapsed lungs; his actions upended the careers of the officers who reported him and who were retaliated against for doing so, "damage[d] the reputation of [law enforcement] officers generally," and "impugn[ed] the credibility and work of the hundreds of upstanding officers" who do their job with distinction at the St. Paul Police Department. <u>See</u> <u>United States v. Boone</u>, 110 F. Supp. 3d 909, 917 (S.D. Iowa 2015).  The collateral damage wrought by Defendant Palkowitsch's use of excessive force and subsequent obstruction is an aggravating factor the Court should consider in imposing sentence.

- <u>Lack of remorse</u>.  As St. Paul Police Chief Todd Axtell testified at trial, one of the most glaring aspects of his disciplinary meeting with Defendant Palkowitsch was Defendant Palkowitsch's lack of remorse and refusal to admit that he had done anything wrong.  As Chief Axtell documented in Defendant Palkowitsch's subsequent termination letter: "During our meeting on November 3, 2016, you stated that you were, 'sorry for the circumstance' but you accepted no responsibility for your decisions or actions.  You displayed no remorse or compassion for the innocent arrested man who received substantial and life changing injuries." <u>See</u> Exhibit C.  At trial, Defendant Palkowitsch again denied that he had done anything wrong.  Defendant Palkowitsch's lack of remorse and refusal to take responsibility for his actions is an aggravating factor the Court should consider in imposing sentence. <u>United States v. French</u>, 719 F.3d 1002, 1009 (8th Cir. 2013) (noting that district court properly factored into the defendant's sentence that he "demonstrated a lack of remorse and an unwillingness to take responsibility for his actions").

These five aggravating factors make Defendant Palkowitsch's offense particularly serious and deserving of a serious Guideline sentence.

Third, a Guideline sentence of 87 months of imprisonment would appropriately account for the importance of general deterrence in this context.  "General deterrence … is one of the key purposes of sentencing," United States v. Medearis, 451 F.3d 918, 920–21 (8th Cir. 2006), and the need for general deterrence is "especially compelling in the context of officials abusing their power," United States v. Boone, 110 F. Supp. 3d 909, 919 (S.D. Iowa 2015) (citing United States v. McQueen, 727 F.3d 1144 (11th Cir. 2013) and United States v. Hooper, 566 F. App'x 771 (11th Cir. 2014) (unpublished)).  That is because excessive force "may easily go undetected and unpunished," so in the rare instance that it is ferreted out, the interest in general deterrence requires that a strong message be sent to would-be violators. McQueen, 727 F.3d at 1158–59 (emphasizing that "[t]he ability to unearth these crimes by law enforcement officers . . . is particularly difficult, and, as we see it, the extraordinarily lenient sentences in this case sap the goal of general deterrence."); see also United States v. Ronda, 455 F.3d 1273, 1302 (11th Cir. 2006) ("[T]he sentences imposed should serve to deter against future criminal activity by these defendants as well as by others similarly situated who may be tempted to violate the law and their oath of office to protect themselves or their fellow officers from possible state or federal criminal investigations."); Hooper, 566 F. App'x at 773 (reversing district court's downward variance in part because it failed to factor in "the need for [Defendant's] sentence to adequately deter other police officers from using excessive force").  As one district court put it, "Even if [the defendant-officer] will likely never violate another person's constitutional rights, a serious sentence on sends a message to all law enforcement officers to not abuse their positions." United States v. Rodella, No. CR 14-2783 JB, 2015 WL 711941, at *51 (D.N.M. Feb. 5, 2015) (unpublished) (sentencing police officer to 121 months of imprisonment for civil rights violation).

The requested Guideline sentence in this case would send a strong message to police officers that if they abuse their authority, they will not get special treatment or a slap on the wrist.

Fourth and finally, a Guideline sentence of 87 months of imprisonment would promote sentence uniformity by aligning Defendant Palkowitsch's sentence with the sentences of similarly situated law enforcement officers convicted of civil rights violations in this circuit. The United States is aware of four cases in this circuit in which an officer was convicted, after a jury trial, of using excessive force: United States v. Boone, 110 F. Supp. 3d 909, 916 (S.D. Iowa 2015), aff'd 828 F.3d 705 (8th Cir. 2016), United States v. Dautovic, Case No. 4:11-cr-159, Doc. No. 127 (S.D. Iowa 2012), rev'd 763 F.3d 927 (8th Cir. 2014), United States v. Wilson, 686 F.3d 868, 869 (8th Cir. 2012), and United States v. Miller, Case No. 4:04-cr-183, Doc. No. 82 (E.D. Ark. 2006), aff'd 477 F.3d 644, 646 (8th Cir. 2007).

The Boone case is particularly instructive because its facts are remarkably similar to this one. In that case, like this one, the defendant-officer responded to an arrest-in-progress in which a suspect was on the ground and non-compliant but was not actively resisting. Boone, 110 F. Supp. 3d at 911–12.  In that case, like this one, the defendant-officer kicked the suspect with his boot, inflicting serious injuries. Id.  In that case, like this one, the defendant-officer bragged about it afterwards, boasting to his girlfriend later that night, which led her to post on Facebook, "So you want to fight with police and you're surprised when you get your ass kicked? Welcome to Des Moines, where law enforcement wears steel toes." United States v. Boone, Case No. 4:13-cr-139, Doc. Nos. 174–78 (S.D. Iowa 2015).

Presented with those facts, the district court in <u>Boone</u> imposed a Guidelines sentence of 63 months of imprisonment,[1] factoring in the "seriousness of section 242 crimes," the need for general deterrence in this context, the collateral impact of the crime, and Boone's "brazen disrespect for the law." <u>Boone</u>, 110 F. Supp. 3d at 917 ("The seriousness of section 242 crimes simply cannot be understated, as they harm far more than individual victims; society as a whole is harmed when those entrusted to protect the public and enforce the laws turn to lawlessness themselves."); <u>Id.</u> ("[T]he specific facts of this case are troubling, particularly in that Defendant committed the act in front of his fellow officers, showing a brazen disrespect for the law. Defendant's act, although only a single kick, caused serious injury to Hill, and was potentially deadly."); <u>Id.</u> ("[T]he offense damages the reputation of police officers generally, and specifically the Des Moines Police Department and 'impugns the credibility and work of the hundreds of upstanding officers who serve with the department.'"); <u>Id.</u> at 919 ("[T]he Court considers deterrence, especially general deterrence, to be particularly important in this case."). On appeal, the Eighth Circuit affirmed the defendant's conviction and sentence. <u>United States v. Boone</u>, 828 F.3d 705 (8th Cir. 2016).

Another analogous case to this one is the prosecution of Arkansas correctional officer Jody Ray Miller for his use of excessive force against two inmates who mouthed off to him. In the first incident, Miller pinned the prisoner to the wall, punched him in the head, and then, after the prisoner fell to the floor, Miller, who was wearing boots, kicked and stomped on him. <u>Miller</u>, 477 F.3d at 646. In the second incident, Miller, who was wearing boots, kicked a handcuffed inmate in the head and body. <u>Id.</u> at 646–47. The district court, in an oral ruling unaccompanied by a statement of reasons, sentenced Miller to 78 months of imprisonment, and the Eighth

---

[1] The parties in <u>Boone</u> did not litigate, and the district court did not consider, the application of the dangerous weapon enhancement for Boone's shod foot, which he used to kick the victim. Had that four-level enhancement been applied, Boone's Guideline range would have been 97–121 months of imprisonment.

Circuit affirmed his conviction and sentence. United States v. Miller, Case No. 4:04-cr-183, Doc. No. 82 (E.D. Ark. 2006), aff'd 477 F.3d 644, 646 (8th Cir. 2007).

The third analogous in-circuit case is the excessive force prosecution of Missouri correctional officer Vernon Wilson, who was convicted of assaulting four inmates over the course of five months.  The assaults traced a similar pattern: an inmate would talk back to Wilson or one of his subordinates, and Wilson would retaliate by assaulting the inmate or by directing other officers or inmates to assault the inmate.  Wilson, 686 F.3d at 870–71.  The district court, in an oral ruling unaccompanied by a statement of reasons, sentenced Miller to 120 months of imprisonment, and the Eighth Circuit affirmed his conviction and sentence. United States v. Wilson, Case No. 4:10-cr-390, Doc. No. 95 (E.D. Mo. 2011), aff'd 686 F.3d 868, 869 (8th Cir. 2012).

The fourth and final analogous in-circuit case is the excessive-force prosecution of Iowa police officer Mersed Dautovic.  In that case, defendant-officer Dautovic was responding to a call for service in his police cruiser with his partner when another vehicle cut them off. Dautovic, 763 F.3d at 929.  Dautovic, furious, activated his lights and siren, pulled over the vehicle, and then he and his partner assaulted the occupants. Id. at 929–31.  A jury convicted Dautovic of excessive force and obstruction of justice, and the district court calculated his Guideline range to be 135–168 months of imprisonment, in light of enhancements for his use of a dangerous weapon, his infliction of serious bodily injury, his physical restraint of the victims, his abuse of authority, and his obstruction of justice. Id. at 931–32.  Despite concluding that Dautovic "show[ed] no remorse for what [he had] done," the district court varied downward 115 months from his Guideline range and imposed a sentence of 20 months of imprisonment. Id. at 932.

On appeal, the Eighth Circuit concluded that the district court's non-Guideline sentence was "unreasonably lenient" under the circumstances, reasoning that:

> Dautovic's offense conduct was egregious. A police officer beat an innocent victim with a dangerous weapon, causing serious bodily injury and permanent physical damage. He arrested Bonds and Evans and then wrote a false police report that caused them to be charged with crimes. At Bonds and Evans's trial, where they were found innocent, Dautovic committed perjury. Dautovic maintained throughout his trial that his actions in the early morning hours of September 13 were reasonable and that his police report was sloppy, not intentionally falsified. A jury, however, found him guilty beyond a reasonable doubt of using excessive force and obstructing justice, and the district court's findings at sentencing were consistent with the jury's verdict. The district court found that Dautovic showed no remorse. . . . Dautovic's offense conduct involved aggravating circumstances, including the use of a dangerous weapon, the physical restraint of Bonds during the course of the beating, and the infliction of serious injury. Moreover, acting under the color of law, Dautovic tried to conceal his wrongdoing by falsifying a police report and lying under oath.

United States v. Dautovic, 763 F.3d 927, 934–35 (8th Cir. 2014).  For all of those reasons, the Eighth Circuit vacated Dautovic's sentence, deeming it substantively unreasonable, and remanded to the district court for re-sentencing. Id. at 936.

With those data points in mind, a Guideline sentence of 87 months of imprisonment for Defendant Palkowitsch would promote sentence uniformity by aligning his sentence with the Guideline sentences imposed in the similar excessive force prosecutions of Boone, Miller, and Wilson.  A Guideline sentence in this case would likewise accord with the Eighth Circuit's guidance in Dautovic that a downward variance resulting in an "unreasonably lenient" sentence would be inappropriate given the "egregious" conduct at issue in that case and in this one: a police officer assaulting "an innocent victim," inflicting "serious bodily injury and permanent physical damage," and attempting "to conceal his wrongdoing by falsifying a police report and lying under oath." Dautovic, 763 F.3d at 934–35.

V.     **RESTITUTION**

Restitution is mandatory in this case because the offense of conviction is a "crime of violence" and because "an identifiable victim . . . has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(a)(1), (c).  The "order of restitution shall require," in the case of an offense resulting in bodily injury to a victim, that the defendant reimburse the victim for (1) "the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care," (2) "the cost of necessary physical and occupational therapy and rehabilitation," (3) "income lost by such victim as a result of such offense," and (4) "lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(2), (4).

The United States has informed Mr. Baker, both in person and via written notice, that he has the right to attend the sentencing hearing, to give a victim-impact statement, and to seek restitution if applicable.  To date, Mr. Baker has not made a restitution request or submitted any supporting documentation.  If Mr. Baker elects to seek restitution, the United States will work with Mr. Baker to identify reimbursable costs and income and to provide documentation to the Court.  If Mr. Baker's losses are not ascertainable 10 days prior to sentencing, the United States will inform the Court, pursuant to 18 U.S.C. § 3664(d)(5), and the Court may schedule a hearing, after the sentencing, to issue a final restitution order.

## VI.    <u>CONCLUSION</u>

For all of the reasons set forth in this sentencing memorandum, the United States respectfully submits that a sentence of 87 months of imprisonment for Defendant Palkowitsch is sufficient, but not greater than necessary, to promote the purposes of sentencing.

Respectfully submitted,

UNITED STATES OF AMERICA, by

ERIC S. DREIBAND
ASSISTANT ATTORNEY GENERAL

/s/ Christopher J. Perras
Christopher J. Perras, MA BN 682002
Special Litigation Counsel
Civil Rights Division
Department of Justice
150 M Street, NE
Washington, DC 20002
Telephone: (202) 353-5939
E-mail: christopher.perras@usdoj.gov

/s/ Zachary Dembo
Zachary Dembo, KY BN 95019
Trial Attorney
Civil Rights Division
Department of Justice
150 M Street, NE
Washington, DC 20002
Telephone: (202) 305-6846
E-mail: zachary.dembo@usdoj.gov

Exhibit A

# ellis law office

**Deborah Ellis**
Lawyer
deborahellis2626@gmail.com

**Criminal Law Specialist**
As Certified by Minnesota Bar Association
Also admitted in Wisconsin

101 East Fifth Street
Suite 1500
Saint Paul, Minnesota 55101
651-288-3554
Fax: 651-293-0993

**Susan Johnson**
Lawyer
susanjohnson2626@gmail.com

**Anica Olson**
Paralegal
ellislaw.asst@gmail.com

January 30, 2020

Gary Smith          **(HAND DELIVERED)**
U.S. Probation
316 N. Robert Street
St. Paul, MN  55101

> **United States v. Palkowitsch**
> **File No. 19-CR-13**

Dear Mr. Smith:

With respect to your preliminary presentence report, the defense requests the following additions, amendments and corrections for completeness and accuracy:

## A.  OFFENSE CONDUCT:

Page 1, paragraph 5.      A more accurate description of the 9-1-1- call, as confirmed by the recording and transcript of the call (which is attached and was Court Exhibit D-16A) is as follows:

An elderly man called 9-1-1 and reported that he saw a group fighting using bats, guns and golf clubs in front of 1891 E. 7th Street.  This neighborhood was well known to police officers as a high crime area with frequent calls involving guns, violence and gang activity.  The caller, who clearly sounded afraid, estimated that there were

1

13 involved in the fight but that he "didn't stand out there and count them."  The caller did not want to give his name, saying he was a "61 year old man" and didn't have "time for all that."  He also said those involved were drinking and smoking weed.  The male caller said he heard a gun shot during the time of his call.  He told the dispatcher he saw one individual with a gun whom he described as a black male wearing a white t shirt and having dreadlocks.  This "in-progress weapons call" required all officers who were available to respond to the area.

We request that the foregoing details follow the first sentence in paragraph 5 and replace the second and third sentences in the preliminary report.  These details were in the 9-1-1 call.  Various officers including Officer Ficcadenti (Ficcadenti Transcript pp. 44-45)[1] testified to the characterization of the call and protocol for responding to in-progress weapons calls.

Page 1, paragraph 6.       The first sentence of the paragraph should include the following:

Officers Dick and Spencer drove to the location with lights and sirens on for approximately 4 minutes. (This is verified by Defense Exhibit 17, played at trial.)   The other responding squads also proceeded with lights and sirens (confirmed by Ficcadenti's testimony in Ficcadenti Transcript pp. 46-47 as well as squad videos).   The paragraph should end after: "The officers did not stop or question F.B."  There is no reason or foundation to opine on those officers' reasons for not stopping or questioning F.B. or to opine that they concluded the "emergency call was unfounded."

---

1.   Pages which are referenced from Brian Ficcadenti's trial testimony are attached.  A full transcript is available if you wish for that to be provided.

Page 1, paragraph 7.      This paragraph should be amended to state the following which is more detailed and accurate:

  Three other squad cars responded to the scene: one occupied by Palkowitsch and his partner Officer Nowicki; another squad car occupied by Officer Raether; another squad car occupied by Officer Ficcadenti and his canine partner Falco.  Officer Ficcadenti observed a black male with dreadlocks wearing a white t shirt in a parked vehicle.  Officer Ficcadenti believed it was his "duty to make contact with the suspect based off the description and the nature of the call . . .." (Ficcadenti Transcript at p. 49).  Officer Ficcadenti exited his squad car with his canine Falco and ordered F.B. to get out of his vehicle.  F.B. had been talking on his cell phone and smoking marijuana and he was slow to exit his vehicle.  F.B. did not follow Officer Ficcadenti's commands; he did not put both of his hands in the air.  Officer Ficcadenti was concerned when he could not see both of F.B.'s hands and thought F.B. appeared to be contemplating running (Ficcadenti Transcript at pp 52-54)  Although trained to give three commands to a suspect before releasing a canine, Officer Ficcadenti did not give any warning to F.B. before releasing Falco.  Officer Ficcadenti believed at the time that it was necessary to release his dog on F.B. without yelling the usual commands because of the potential for a deadly force encounter.  Officer Ficcadenti was concerned that F.B. was going to shoot him.  Falco was not on a leash when he was released by Officer Ficcadenti. Falco grabbed onto F.B.'s leg and spun F.B. around on the ground in the parking lot.  Officers Spencer and Dick arrived just as Ficcadenti released Falco to apprehend F.B.  When Officers Nowicki, Raether and Palkowitsch arrived on the scene, Falco was already engaged on F.B., a black male in a white t shirt wearing dreadlocks.

3

The foregoing narrative is supported by Officer Ficcadenti's trial testimony. (Ficcadenti Transcript pages 54 to 66, 79 - 83 are attached.)

Page 2, paragraph 8.    The last sentence should be replaced with the following which is more accurate and detailed:

Officer Nowicki served as lethal cover on F.B., holding his AR-15 pointed directly at F.B. Nowicki focused his attention on F.B.'s mid-section where weapons are often concealed by suspects. F.B. was ordered by Officer Ficcadenti to stop moving and turn over and keep his hands out. He did not follow those commands. The dog remained engaged on F.B.'s leg and Officer Ficcadenti repeatedly praised the dog, stating "Good dog, good dog."

Page 2, paragraph 9.    This paragraph should be replaced with the following which is more accurate and detailed:

While the dog was engaged on F.B.'s leg, Officer Ficcadenti continually ordered F.B. to put his hands behind his back but F.B. did not comply; F.B. was reaching around and turning from his back to his side. F.B. moved his hands toward his mid-section and moved his body toward a sitting position. (Ficcadenti Transcript at pp. 95, 98) Palkowitsch and another officer joined Ficcadenti in giving commands. Palkowitsch told F.B. not to move and when F.B. did not obey the command, Palkowitsch delivered two kicks to F.B.'s midsection. F.B. appeared to stop resisting but before handcuffs could be put on him, F.B. again curled up to a seated position with his hands at his mid-section. Palkowitsch delivered a third kick and F.B. said, "ok," put both hands out and was handcuffed by Palkowitsch.

Page 2, paragraph 10.    This paragraph should be replaced with the following which is more accurate and detailed:

4

The canine was released from F.B.'s leg once F.B. was in handcuffs and Officer Ficcadenti concluded that F.B. was no longer a danger. (Ficcadenti Tanscript at p. 59.)  The canine had been engaged a total of 71 seconds on F.B.  The canine engagement of F.B.  was approximately three times the average length of time for a canine engagement according to a St. Paul Police canine trainer.  Officer Ficcadenti was found to have been responsible for numerous errors in his handling of the apprehension of F.B. including releasing the dog too soon, failing to control the scene and failing to give directives to the officers who came to his assistance.  (Ficcadenti Transcript at pp. 104-109.) When F.B. asked the officers why he was being arrested, Palkowitsch told him they had received a report of a black male, in a white t shirt and dreadlocks who had a gun. When F.B. stated that he was having trouble breathing, Palkowitsch and Officer Dick assisted F.B. toward a nearby squad car and medical help was called.  Two officers made a visual search from the outside of F.B.'s vehicle and saw no weapon.

Page 2, paragraph 11.     The following should be added after the first three sentences which provides more detail:

F.B.'s lungs stabilized and he was moved from ICU the day after his admission.  F.B. remained hospitalized for approximately 2 additional weeks to undergo four surgeries to repair and graft two large leg wounds caused by the dog bite. The wounds measured 5 x 6 centimeters and 13 x 5 centimeters respectively and have permanently scarred his right lower leg.

Page 2, paragraph 12.     The last sentence should be deleted or alternatively re-written to accurately state:

A female officer recalled receiving a photograph of F.B. in the hospital by text message following F.B.'s arrest.  The text

message mentioned broken ribs which the female officer interpreted as being boastful.

Page 2, paragraph 13.     This paragraph should be deleted altogether.

First, Officer Spencer left the police department shortly after the incident involving F.B. and was not subject to retaliation from other officers.  Second, Palkowitsch had no part in the writing on a newspaper article posted in the locker room; Palkowitsch not working at the department at that time and had no access to the premises.

Page 2, paragraph 14.     This paragraph should perhaps follow paragraph 11 and be replaced with the following which is more accurate and detailed:

Officer Ficcadenti issued F.B. a citation for obstructing legal process while F.B. was in the hospital the night of his arrest. Ficcadenti noted on the citation that F.B was a suspect in a weapons call and was said to have a handgun and F.B. "refused commands."   Ficcadenti Transcript at pp. 69-73.   The charge was later dismissed by a prosecutor for the City of St. Paul.

Pages 2-3, paragraph 15. Beginning at the second sentence, the paragraph should read as follows which is more accurate and detailed:

In November 2016, the chief of police informed Officers Ficcadenti and Palkowitsch of his intent to terminate them. One week after issuing those notices, the chief of police offered to retract the termination of Officer Ficcadenti if Ficcadenti would agree to a 30 days suspension and not grieve the discipline.  Officer Ficcadenti accepted that offer. Palkowitsch filed a grievance over his termination and after a hearing at which numerous witnesses testified (many of whom testified at trial), the arbitrator determined that Officers Ficcadenti and Palkowitsch should be treated similarly for their

conduct.  Palkowitsch was ordered reinstated with backpay except for 30 days which matched the 30 day suspension given to Ficcadenti.

Additional paragraphs:  The following paragraphs should be added:

- F.B. filed a federal law suit against the five officers present at his arrest as well as the chief of police and supervising officers. *See Baker v. Ficcadenti, et al,* D. Minn. 17-CV-4976 (RHK/DTS).  The City of St. Paul settled the lawsuit with Mr. Baker for two million dollars six weeks after the suit was filed.  The individual officers were dismissed as part of the settlement.

- The Department of Justice learned of the two million dollar settlement in F.B.'s civil rights suit and began an investigation into possible criminal civil rights violations.  Officers Brian Ficcadenti and Palkowitsch were both targets of that investigation by the Department of Justice beginning in the summer of 2018.  (Ficcadenti Transcript at pp. 110-11.)

- In December 2019, the Government offered Officer Ficcadenti immunity from prosecution.  Officer Ficcadenti asserted his Fifth Amendment privilege and was ordered to testify at Palkowitsch's trial.  He testified that he failed to follow proper protocol while handling his canine and failed to take charge of the apprehension of F.B. on June 24, 2016.  Officer Ficcadenti confirmed that his police report, internal affairs interview and citation issued to F.B. for obstruction of justice were all accurate.

- Palkowitsch returned to work at the St. Paul Police Department in April 2017.  He received excellent performance reviews and commendations for his work from April 2017 until he was placed on administrative leave in January 2019 following the indictment.  He has one

disciplinary citation in his file from 2013 when he incorrectly wrote down a license plate number of a stolen vehicle which resulted in the wrong citizen's vehicle being impounded and the owner of the vehicle being briefly detained.  Palkowitsch and his field training officer received oral reprimands for the incident. See attached Internal Affairs report.

**B.  Victim Impact** (preliminary PSR at paragraphs 16 through 19)

This section should include the fact that F.B. received a two million dollar settlement from his civil lawsuit brought against Palkowitsch and 9 other officers (two John Does) as well as the Chief of Police and the City of St. Paul.

**C.  Acceptance of Responsibility** (preliminary PSR paragraph 21)

As noted in paragraph 21 of the PSR, Palkowitsch is not automatically precluded from consideration for an acceptance of responsibility reduction. In this regard, although there was a jury trial, Palkowitsch has consistently admitted the conduct which underlies his conviction.  He admitted in the Internal Affairs proceeding, the grievance proceeding and at trial that he kicked F.B. three times on June 24, 2016 while multiple officers were attempting to restrain F.B. and put him in handcuffs.  Palkowitsch did not falsely deny or frivolously contest the conduct underlying his conviction. The jury found however that Palkowitsch's conduct violated F.B.'s constitutional rights.  According to Application Note 2, Under Section

4E1.1(a), Palkowitsch qualifies for and should receive a decrease of two

levels for acceptance.

**D. Offense level computation** (preliminary PSR at paragraphs 22 through 31).

The appropriate guideline application is found at Section2H1.1 without

reference to Section 2A2.2.   Under Section 2H1.1, the base offense level should

be calculated beginning at level 12 (Section 2H1.1(a)(2) – an offense involving two

or more participants (Palkowitsch and Ficcadenti).  A six level increase is

appropriate because Palkowitsch was a public official at the time of the offense

(Section 2H1.1(b)(1)).   A two level decrease is appropriate for acceptance of

responsibility which results in a total offense level of 16 and an advisory guideline

range of 21 to 27 months at Criminal History 1.

Application of the aggravated assault guidelines is misguided under the

facts of this case.  The jury's determination that Officer Palkowitsch used

excessive force does not convert his actions into an aggravated assault.  Where

two potential guideline applications arguably apply, the rule of lenity directs that

the least severe of those guideline ranges apply.  Moreover, your calculation

draws from both 2H1.1 <u>and</u> 2A2.2.  That is, you have recommended that the base

offense level under 2H1.1(a)(1) draw from Section 2A2.2 and you used specific

9

offense characteristics from that section, i.e. 2A2.2(b) and also a specific offense characteristic from Section 2H1.1 apply.  That amounts to double counting.

If the base offense level under 2H1.1 is appropriately drawn from Section 2A2.2, the base offense level from Section 2A2.2(a) is 14 and the specific offense characteristic from Section 2H1.1(b) applies, which is the six level increase because Palkowitsch was a public official.  Section 2H1.1 only directs that the base offense level be borrowed from Section 2A2.2 not the offense characteristics. Thus the calculation, using base offense level 14 would be 14 +6 -2 for a total offense level of 18.

Assuming arguendo that all of Section 2A1.1 applies (which we do not agree does), the following more aptly fits the facts:

| | |
|---|---|
| Base Offense Level | 14 |
| Degree of Injury (between "bodily injury" and "serious bodily injury" (2A2.2(b)(3)(D)) | +4 |
| Acceptance of responsibility | -2 |
| Total Offense Level | 16 |

At total offense level 16 and criminal history score of 1, the advisory range is 21 to 27 months.  If Section 2A2.2 is considered the applicable section for both base offense level and offense characteristics, the six levels you have added in

paragraph 24 must be deleted because you have used offense characteristics from both 2A2.2 and 2H1.1.

In sum, we submit that the appropriate guideline section is found at 2H1.1 which applies to law enforcement officers and the resulting total offense level is 16  (12+ 6 -2) with an advisory range of 21 to 27 months.

### E.   Personal and Family Data

Page 6, paragraph 40.       Palkowitsch is <u>32</u> years old

Page 6, paragraph 41.       Jessica Palkowitsch's date of birth is 9/8/1982. She is married to Seijen Takmura, date of birth 9/17/1985.

Page 6, paragraph 45.       I believe you have conducted an interview with Mrs. Palkowitsch.

Page 7, paragraph 46       A home visit has been conducted.

Page 8, paragraph 56       Palkowitsch is currently working for Walser Chevrolet; his employer has been advised of his circumstances.

### F.   Financial Condition (preliminary PSR at paragraph 61)

There was no civil judgment against Brett Palkowitsch in the civil case brought by F.B. so the notation of two million dollars as a civil judgment and a liability in paragraph 61 should be deleted.

We respectfully request that the above additions, corrections, and modifications be made to your preliminary report.  If there is more information or materials you need from me, please do not hesitate to contact me.

Very truly yours,

Deborah Ellis

cc:  Christopher Perras and Zachary Dembo – by email only

Exhibit B

**From:**      Perras, Christopher (CRT)
**To:**          Deborah Ellis
**Cc:**          Kevin Short; Dembo, Zachary (CRT)
**Subject:**  US v. Palkowitsch
**Date:**      Friday, February 1, 2019 1:20:00 PM
**Attachments:**  Palkowitsch supplemental questionnaire.doc
                    Palkowitsch Guidelines calculations.docx
                    Corder supplementary questionnaire.pdf
                    16-124 Juror Questionnaire FINAL.pdf
                    Palkowitsch motion for supplementary jury questionnaire.docx

Ms. Ellis,

It was nice to meet you and Mr. Short yesterday. I'm writing to follow up on a few of the matters we discussed.

The court set the motion hearing date before Magistrate Judge Schultz for March 14th at 10am. Mr. Dembo is unavailable on that date. It would be our preference to move the hearing, assuming there are motions to litigate, to one of the days on the following week: March 18, 21, or 22. Would any of those dates work for you?

Our proposed motion for a supplementary jury questionnaire and our proposed questionnaire are attached, along with two similar questionnaires I've used in past federal color-of-law cases. It's my practice to keep questionnaires to ten questions or fewer; I've found that judges are less likely to approve lengthy questionnaires. If you're interested in submitting this as a joint motion, and you think there are any other topics we should cover, let's chat about it. If you oppose the motion, please let me know so I can indicate your position when I file it.

Finally, during our meeting yesterday, you asked for my preliminary Guidelines calculations. Attached is a chart reflecting that, according to our calculations, your client's Guidelines range if he were convicted after trial would be 87-108 months of imprisonment. Of course, that Guidelines range is subject to change based on what is established at trial or negotiated via plea.

If you have any questions, feel free to give me a call.

Best,

**Christopher Perras | Trial Attorney | Criminal Section | Civil Rights Division**
U.S. Department of Justice | 601 D St., NW, Room 5526 | Washington, DC | 20004
Office: 202.353.1130 | Mobile: 202.353.5939 | christopher.perras@usdoj.gov

United States v. Palkowitsch, No. 19-cr-13-WMW-DTS
Preliminary Guidelines calculations

| § 2H1.1(a)(1)→ § 2A2.2(a) | Base Offense Level | 14 |
|---|---|---|
| § 2A2.2(b)(2)(B) | Adjustment for use of a dangerous weapon (shod foot) | +4 |
| § 2A2.2(b)(3)(B) | Adjustment for serious bodily injury | +5 |
| § 2H1.1(b)(1) | Adjustment for color of law | +6 |
| | | |
| | Total Offense Level | 29 |
| | Guideline Range | 87–108 months |

Exhibit C

DEPARTMENT OF POLICE
*Todd D. Axtell, Chief of Police*

 **CITY OF SAINT PAUL**
*Christopher B. Coleman, Mayor*

*367 Grove Street*            Telephone:   651-266-5588
*Saint Paul, Minnesota 55101*   Facsimile:   651-266-5542

November 7, 2016

Brett Palkowitsch
367 Grove Street
Saint Paul, MN 55101

Dear Mr. Palkowitsch:

This letter is to advise you that your employment with the City of Saint Paul Police Department is terminated, effective November 3, 2016. You were offered an opportunity to provide input on this decision and a meeting was held on November 3, 2016. Present at the meeting were you, Police Federation President Dave Titus, union attorney Chris Wachtler, Assistant City Attorney Gail Langfield, Senior Commander Robert Thomasser and myself.

On June 24, 2016, you assisted on a disturbance call behind 1871 7th Street E. When you arrived on scene, you found another officer affecting the arrest of a citizen with the assistance of his K-9 partner. The citizen was clearly incapacitated, and was unable to respond to the commands of the K-9 officer due to the K-9's constant bite on his lower leg. Despite your observations that the citizen was unable to respond to commands, and that the citizen's hands were visible and not holding anything, you made the decision to deliver three separate kicks directly to the torso of the citizen. These kicks were intentionally delivered to non-approved target areas and resulted in the citizen suffering substantial injury, including broken ribs and two collapsed lungs.

An investigation, IA #16-0707, was conducted in response to your actions, which analyzed both your conduct as well as the training you have been provided as a Saint Paul Police officer in responding to resistance and aggression, and in affecting an arrest with the assistance of a K-9 officer. This investigation determined that your response to the resistance and aggression in this arrest was contrary to the training you received since you became an officer in 2013.

The investigation was presented to the Police Civilian Internal Affairs Review Commission who sustained two complaints against you. The commission sustained both an Improper Procedure and an Excessive Force for the three kicks you delivered during this incident and I concur.

During our meeting on November 3, 2016, you stated that you were, "sorry for the circumstance" but you accepted no responsibility for your decisions or actions. You displayed no remorse or compassion for the innocent arrested man who received substantial and life changing injuries. In fact, based on your articulation of the event, I believe you would make the same decisions in the

AA-ADA-EEO Employer

US007897

IAU 16-0707
Mr. Palkowitsch
Page 2 of 2

future and during similar circumstance. Your failure to recognize your mistake and your complete disregard for your responsibility to those we arrest and to department policies is unacceptable. You were provided clear and specific training and you did not follow it.

In conclusion, nothing was said at the meeting that caused me to change my mind. The decision to terminate you is based on the grounds set forth in my letter to you dated October 28, 2016 which is incorporated by this reference and attached. I advised you of my decision to terminate you following a short deliberation during our meeting on November 3, 2016 so that you would not have to wait on my decision.

You have the right to appeal this action and if you wish you should contact your union representative for guidance. Please take note of the varying appeal timelines under civil service rules and/or your labor contract.

Sincerely,

Todd D. Axtell
CHIEF OF POLICE

cc:    Assistant Chief Kathy Wuorinen
       Deputy Chief Matt Toupal
       Angela Nalezny, Human Resources Director
       Ben Reber, Labor Relations
       Gail Langfield, City Attorney
       Police Human Resources