**UNITED STATE DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**Case No. 19-CR-13 (WMW/DTS)**

UNITED STATES OF AMERICA,

      plaintiff,               **DEFENDANT'S POSITION WITH**
                               **RESPECT TO SENTENCING**

      v.

BRETT PALKOWITSCH,

      defendant.

_____

Brett Palkowitsch through counsel, Deborah Ellis, urges the Court to calculate his advisory guideline range at 21– 27 months and grant him departures and a variance from the advisory guideline range and place him on probation. The defense will address sentencing issues as follows:

1.  Objections to Presentence Report            Page 2

    (a)    The Offense Conduct            Page 2
    (b)    Applicable Guideline Calculations    Page 8
    (c)    Acceptance of Responsibility       Page 9

2.  Request for variance in view of Title 18, Section 3553(a) factors

    (a)    History and Characteristics of the defendant    Page 15
    (b)    Nature and circumstances of the offense    Page 21
    (c)    The need for the sentence imposed    Page 23
    (d)    Kinds of sentences available    Page 26
    (e)    Need to avoid unwarranted disparities    Page 27

Conclusion                      Page 37

Index to Attachments              Page 41

1

1. <u>Objections to Presentence Report</u>

    (a)    The Offense Conduct

The defense proposed several additions, amendments and corrections to the Offense Conduct recited by the probation officer in paragraphs 4 through 15 of the presentence report (PSR). The defense urges the Court to order that the Offense Conduct section of the PSR be amended to fairly and accurately describe the entirety of circumstances that led to Brett Palkowitsch's actions on June 24, 2016. The following are important facts which were established at trial and are important for sentencing determination. *See* Section 6A1.3(a), United States Sentencing Guidelines (USSG). Without these additions, amendments and corrections, the Offense Conduct is misleading and leaves a false impression of the circumstances surrounding F.B.'s detention and Palkowitsch's actions:

Paragraph 5, page 1:

> A more accurate description of the 9-1-1- call, as confirmed by the recording and transcript of the call, (which is attached and was Court Exhibit D-16A) is as follows:
>
> An elderly man called 9-1-1 and reported that he saw a group fighting using bats, guns and golf clubs in front of 1891 E. 7th Street. This neighborhood was well known to police officers as a high crime area with frequent calls involving guns, violence and gang activity. The caller, who clearly sounded afraid, estimated that there were 13 involved in the fight but that he "didn't stand out there and count them." The caller did not want to give his name, saying he was a "61 year old man" and didn't have "time for all that." He also said those involved were drinking and smoking weed. The male caller said he heard a gun shot during the time of his call. He told the dispatcher he saw one individual with a gun whom he described as a black male

wearing a white t-shirt and having dreadlocks. This "in-progress weapons call" required all officers who were available to respond to the area.

We request that the foregoing details follow the first sentence in paragraph 5 and replace the second and third sentences in the preliminary report. These details were in the 9-1-1 call. Various officers including Officer Ficcadenti (Ficcadenti Transcript pp. 44-45)[1] testified to the characterization of the call and protocol for responding to in-progress weapons calls. The notation that, "The caller, who refused to provide a name and did not answer a return call . . .." unless corrected leaves a false impression that Palkowitsch was wrong to respond to the call because it lacked some legitimacy, all of which is contradicted by the record at trial.

Paragraph 7, page 2:

The PSR mischaracterizes F.B.'s response to Officer Ficcadenti. The last two sentences of this paragraph should be amended to read:

F.B. did not follow Officer Ficcadenti's commands; he did not put both of his hands in the air. Officer Ficcadenti was concerned when he could not see both of F.B.'s hands and thought F.B. appeared to be contemplating running (Ficcadenti Transcript at pp 52-54). Although trained to give three commands to a suspect before releasing a canine, Officer Ficcadenti did not give any warning to F.B. before releasing Falco. Officer Ficcadenti believed at the time that it was necessary to release his dog on F.B. without yelling the usual commands because of the potential for a deadly force encounter. Officer Ficcadenti was concerned that F.B. was going to shoot him. Falco was not on a leash when he was released by Officer Ficcadenti. Falco grabbed onto F.B.'s leg and spun F.B. around on the ground in the parking lot. Officers Spencer and Dick arrived just as Ficcadenti released Falco to apprehend F.B. When Officers Nowicki, Raether and Palkowitsch arrived on the scene, Falco was already engaged on F.B., a black male in a white t-shirt wearing dreadlocks.

---

1.      A transcript of Brian Ficcadenti's trial testimony was filed in this case at ECF # 119.

The foregoing narrative is supported by Officer Ficcadenti's trial testimony.  (Ficcadenti Transcript at pp 54 - 66, 79 – 83.)

Paragraph 8, page 2.        The last sentence should be replaced with the following which is more accurate and detailed:

Officer Nowicki served as lethal cover on F.B., holding his AR-15 pointed directly at F.B.  Nowicki focused his attention on F.B.'s mid-section where weapons are often concealed by suspects.  F.B. was ordered by Officer Ficcadenti to stop moving and turn over and keep his hands out.  He did not follow those commands.  The dog remained engaged on F.B.'s leg and Officer Ficcadenti repeatedly praised the dog, stating "Good dog, good dog."

Paragraph 9, page 2.        This paragraph should be replaced with the following which is more accurate and detailed:

While the dog was engaged on F.B.'s leg, Officer Ficcadenti continually ordered F.B. to put his hands behind his back but F.B. did not comply; F.B. was reaching around and turning from his back to his side.  F.B. moved his hands toward his mid-section and moved his body toward a sitting position.  (Ficcadenti Transcript at pp. 95, 98) Palkowitsch and another officer joined Ficcadenti in giving commands.  Palkowitsch told F.B. not to move and when F.B. did not obey the command, Palkowitsch delivered two kicks to F.B.'s midsection.  F.B. appeared to stop resisting but before handcuffs could be put on him, F.B. again curled up to a seated position with his hands at his mid-section.  Palkowitsch delivered a third kick and F.B. said, "ok," put both hands out and was handcuffed by Palkowitsch.

Paragraph 10, page 2.       This paragraph should be replaced with the following which is more accurate and detailed:

The canine was released from F.B.'s leg once F.B. was in handcuffs and Officer Ficcadenti concluded that F.B. was no longer a danger.  (Ficcadenti Transcript at p. 59.)   The canine had been engaged a total of 71 seconds on F.B.  The canine engagement of F.B.  was approximately three times the average length of time for a canine engagement according to a St. Paul Police canine trainer.  Officer

Ficcadenti was found to have been responsible for numerous errors in his handling of the apprehension of F.B. including releasing the dog too soon, failing to control the scene and failing to give directives to the officers who came to his assistance. (Ficcadenti Transcript at pp. 104-109.) When F.B. asked the officers why he was being arrested, Palkowitsch told him they had received a report of a black male, in a white t shirt and dreadlocks who had a gun. When F.B. stated that he was having trouble breathing, Palkowitsch and Officer Dick assisted F.B. toward a nearby squad car and medical help was called. Two officers made a visual search from the outside of F.B.'s vehicle and saw no weapon.

Paragraph 11, page 2.     The following should be added after the first three sentences which provides more detail:

F.B.'s lungs stabilized and he was moved from ICU the day after his admission. F.B. remained hospitalized for approximately 2 additional weeks to undergo four surgeries to repair and graft two large leg wounds caused by the dog bite. The wounds measured 5 x 6 centimeters and 13 x 5 centimeters respectively and have permanently disfigured his right lower leg.

Paragraph 12, page 2.     The last sentence should be deleted or alternatively re-written to accurately state:

A female officer recalled receiving a photograph of F.B. in the hospital by text message following F.B.'s arrest. The text message mentioned broken ribs which the female officer interpreted as being boastful.

Paragraph 13, page 2.     This paragraph should be deleted altogether. Inclusion of this paragraph suggests some wrongdoing by Palkowitsch when in fact he had absolutely no part in the writing on a newspaper article posted in the locker room. Palkowitsch was not working at the department at that time and had no access to the premises.

Paragraph 14, page 2.        This paragraph should perhaps follow paragraph
                             11 and be replaced with the following which is
                             more accurate and detailed:

Officer Ficcadenti issued F.B. a citation for obstructing legal process
while F.B. was in the hospital the night of his arrest. Ficcadenti noted
on the citation that F.B was a suspect in a weapons call and was said
to have a handgun and F.B. "refused commands." Ficcadenti
Transcript at pp. 69-73. The charge was later dismissed by a
prosecutor for the City of St. Paul.

Paragraph 15, pages 2-3. Beginning at the second sentence, the paragraph
                         should read as follows which is more accurate and
                         detailed:

In November 2016, the chief of police informed Officers Ficcadenti
and Palkowitsch of his intent to terminate them. One week after
issuing those notices, the chief of police offered to retract the
termination of Officer Ficcadenti if Ficcadenti would agree to a 30
days suspension and not grieve the discipline. Officer Ficcadenti
accepted that offer. Palkowitsch filed a grievance over his
termination and after a hearing at which numerous witnesses testified
(many of whom testified at trial), the arbitrator determined that
Officers Ficcadenti and Palkowitsch should be treated similarly for
their conduct. Palkowitsch was ordered reinstated with backpay
except for 30 days which matched the 30 day suspension given to
Ficcadenti. See Attachment 1, Grievance Arbitration and award dated
April 3, 2017.

Additional paragraphs: The following paragraphs should be added to the
PSR as these facts are important for sentencing determination:

- F.B. filed a federal law suit against the five officers present at
  his arrest as well as the chief of police and supervising officers.
  *See Baker v. Ficcadenti, et al,* D. Minn. 17-CV-4976
  (RHK/DTS). The City of St. Paul settled the lawsuit with Mr.
  Baker for two million dollars six weeks after the suit was filed.
  The individual officers were dismissed as part of the settlement.

- The Department of Justice learned of the two million dollar settlement in F.B.'s civil rights suit and began an investigation into possible criminal civil rights violations. Officers Brian Ficcadenti and Palkowitsch were both targets of that investigation by the Department of Justice beginning in the summer of 2018. (Ficcadenti Transcript at pp. 110-11.)

- In December 2019, the Government offered Officer Ficcadenti immunity from prosecution. Officer Ficcadenti asserted his Fifth Amendment privilege and was ordered to testify at Palkowitsch's trial. He testified that he failed to follow proper protocol while handling his canine and failed to take charge of the apprehension of F.B. on June 24, 2016. Officer Ficcadenti confirmed that his police report, internal affairs interview and citation issued to F.B. for obstruction of justice were all accurate.

- Palkowitsch returned to work at the St. Paul Police Department in April 2017. He received excellent performance reviews and commendations for his work from April 2017 until he was placed on administrative leave in January 2019 following the indictment. He has one disciplinary citation in his file from 2013 when he incorrectly wrote down a license plate number of a stolen vehicle which resulted in the wrong citizen's vehicle being impounded and the owner of the vehicle being briefly detained. Palkowitsch and his field training officer received oral reprimands for the incident.

(b)     Applicable Guideline Calculations

The appliable guidelines in this case are found in Section 2H1.1 of the

United States Sentencing Guidelines (U.S.S.G.). Section 2H1.1 applies to

Offenses Involving Individual Rights and specifically references 18 United States

Code Section 242, the statute under which Palkowitsch was convicted. Under

Section 2H1.1, the base offense level should be calculated at <u>12</u> for an offense involving two or more participants (Palkowitsch and Ficcadenti).  See Section 2H1.1(a)(2), U.S.S.G.  An additional six levels should be added because Palkowitsch was a public official at the time of the offense.  See Section 2H1.1(b).  This results in a total offense level of 18 and an advisory guideline range of 27 to 33 months.

The recommendation of United States Probation that the guidelines' Section 2A2.2 be applied is not merely misguided but clearly wrong under the facts in this case.  According to Section 2H1.1(a)(1), the court is directed to "apply the greatest" of levels 6, 10, 12 or "the offense level from the offense guideline applicable to any underlying offense."  Section 2H1.1(a)(1), U.S.S.G.  Applying Section 2A1.1 to Palkowitsch would mean finding that he committed an aggravated assault upon F.B. which is far from the reality.  At the most, Palkowitsch used excessive force in assisting in F.B.'s arrest which resulted in injury to F.B.  An aggravated assault according to the sentencing guidelines is a "felonious assault."  Section 2A2.2, Application Note 1.

The term "aggravated assault" has no common law meaning according to Black's Dictionary (Revised 11th Edition 2019).  Federal felony assaults on the other hand run a gambit of assaults upon government officers or employees, within Indian territories.  See Sections 111 through 119 of Title 18.  At its core, an assault

is an act undertaken with intent to cause harm.  Palkowitsch's intent was not to harm F.B. but to gain his compliance with police commands.  Using excessive force to gain compliance of a suspect does not automatically transform an officer's conduct into a felonious assault.  Section 2A2.2 is inapplicable under the facts of this case.

Application of the aggravated assault guidelines for civil rights violations must be reserved for those instances where the defendant's conduct is "more reprehensible than a civil rights violation" as the Seventh Circuit Court of Appeals noted in *United States v. Cozzi*, 613 F.3d 725, 733 (7th Cir. 2010).  Although Palkowitsch's kicks resulted in serious injury to F.B., his use of force was not more reprehensible than a garden variety civil rights violation.  Palkowitsch did not kick an already restrained suspect; he did not gratuitously use force, nor did he use force out of anger or to retaliate against F.B. for something F.B. did to Palkowitsch.

If, however, this Court determines that Section 2A2.2 is applicable to Palkowitsch, the probation officer's use of the offense characteristics from Section 2A2.2 <u>and</u> 2H1.1 is a miscalculation under the sentencing guidelines.  If Section 2A2.2 is to be applied and the base offense level set at 14, either the specific offense characteristics under 2A2.2(b) or the offense characteristics under 2H1.1(b) apply.  Both cannot apply.

Probation responded to the defense objection in this regard in the Addendum to the PSR at page 5.  Probation cited Section 1B1.5(b)(1) and (b)(2) as providing the basis for using offense characteristics from both Section 2A2.2 and 2H1.1. Section 1B1.5(b)(2) states clear that "An instruction to use a <u>particular</u> subsection or table from another offense guideline refers <u>only</u> to that particular subsection or table reference . . .." Section 1B1.5(b)(2) (emphasis added).  As such, the directive in Section 2H1.1 to "Apply the Greatest" <u>base offense</u> from either 2H1.1(a) or from the underlying offense, only the base offense subsection from the underlying offense must be used.  To the extent Sections 1B1.5(b)(1) and (b)(2) conflict, the interpretation that allows for a more lenient interpretation must prevail.

The United Sentencing Guidelines are intended to serve as a compass for determining starting points for criminal offense.  Probation's proposed application of the guidelines – using enhancements from both Sections 2A1.1 and 2H1.1 make the Guidelines into an instrument for lengthy incarceration.  This is evidenced by the fact that the recommended Guideline applications result in a guideline range close to the statutory maximum of 10 years for Palkowitsch's conviction.  18 U.S.C. § 242.

Applying the guideline section specific to offenses involving individual rights, an increase of 6 levels applies because Palkowitsch acted under color of law.  Hence, the total offense level would be 20, with a beginning advisory range

of 33-41 months.  Applying a 2 level decrease for acceptance of responsibility, the total offense level is 18, with an advisory range of 27-33 months.

If only the specific offense characteristics under Section 2A2.2(b) are applied, then the base offense level of 14 increases by 4 for a dangerous weapon and 5 for serious bodily injury (Section 2A2.2(b)(2) and (b)(5)) minus two for acceptance of responsibility. The total offense is then 21 with an advisory guideline range of 37 to 46 months.

This Court should reject Probation's proposed use of multiple enhancing guideline section, which applications serve as a weapon to reach an exceptionally high and punitive guideline range.

The Court is free to reject and sentence outside an advisory guideline range based on policy considerations. *Kimbrough v. United States,* 552 U.S. 85 (2007). Applying specific offense characteristics from two separate guideline applications is patently unfair and serves to over criminalize a single course of conduct.

(c)     Acceptance of Responsibility

As noted in paragraph 21 of the PSR, Palkowitsch is not automatically precluded from consideration for an acceptance of responsibility reduction. In this regard, although there was a jury trial, Palkowitsch has consistently admitted the conduct which underlies his conviction.  He admitted in the Internal Affairs proceeding, the grievance proceeding and at trial that he kicked F.B. three

times on June 24, 2016 while multiple officers were attempting to restrain F.B. and put him in handcuffs.  Palkowitsch did not deny the conduct underlying his conviction but denied criminal intent. The jury found however that Palkowitsch's conduct violated F.B.'s constitutional rights.

Palkowitsch cannot be penalize for going to trial nor for his testimony, in which he testified as to why he used foot strikes and what his perception was at the time.  Nor should this Court overlook the fact that following an arbitration hearing, the arbiter found that Palkowitsch's conduct warranted a 30 days suspension from work, the same consequence that was imposed for Officer Ficcadenti.

Palkowitsch has truthfully admitted the conduct comprising the offense. Palkowitsch did not falsely deny or frivolously contest relevant conduct.  See Section 3E1.1 (a), Application Note 1(A).  He therefore qualifies for and should receive a decrease of two levels for acceptance of responsibility.

Using the defense's position that Section 2H1.1 is the applicable guideline section to apply, using base offense level 12 +6 -2, the total offense level is 16 with a guideline range is 21- 27 months.

If the Court finds Section 2A2.2 as the appliable starting point, the total offense level with acceptance of responsibility is 14 + 6 -2 for a total offense level of 18 and a guideline range of 27 to 33 months.

Palkowitsch was not alone in perceiving that F.B. was the suspect with a

weapon.  F.B. matched the description of the suspect as aired by dispatch, was

being apprehended by a canine and was not complying with multiple commands.

Palkowitsch's perception that F.B. presented a danger if not handcuffed was shared

by other officers and was reasonable.  This factor should be considered under

Section 5K2.10(3), U.S.S.G.

Section 5K2.11 also provides that a reduced sentence, or departure, may be

appropriate provided society's interest in punishing the conduct.   Despite an

adverse verdict against a St. Paul Police Officer, imprisonment of a police officer

for conduct made in the throes of an increasingly chaotic and dangerous situation

in less than one minute will serve to chill the engagement of law enforcement

officers in responding to dangerous calls.

2.   Request for variance to a reasonable sentence

Although this Court must begin the sentencing proceedings by correctly

calculating the applicable guidelines range, the Court "may not presume that the

Guidelines range is reasonable."  *Gall v. United States*, 553 U.S. 38, 49-50 (2007).

Rather the sentencing courts have been directed to consider all the factors

enumerated in 18 United States Codes Section 3553(a) and "make an

individualized assessment based on the facts presented."  *Id.*

As this Court is ably aware, the advisory nature of the guidelines means

there is "essentially no limit on the number of potential facts that may warrant a

departure" from those guidelines.  18 U.S.C. § 3661; *see Koon v. United States*, 518 U.S. 81 (1996). Section 3553(a) of Title 18 directs that not only the nature and circumstances of the offense but also the history and characteristics of the defendant be considered by the sentencing court.  The Supreme Court advised that Section 3553(a), "as modified by *Booker,* contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the traditional goals of sentencing."  *United States v. Kimbrough,* 552 U.S.85, 101 (2007).

The Supreme Court has recognized a "uniform and constant in the federal judicial tradition that the sentencing judge must consider every convicted person as a individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Pepper v. United States*, 562 U.S. 367, 486 (2011) *citing Koon v. United States,* 518 U.S. 81, 113 (1996).

Because Palkowitsch's actions fall outside the "heartland" of similar cases, a departure or variance from an advisory assault guideline range, particularly if this Court finds that Section 2A1.1 is the advisory guideline section.   The sentencing statute allows the Courts to depart from a guideline-specified sentence when it finds "an aggravating or mitigating circumstance of a kind or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating

the guidelines that would result in a sentence different from that describes.  18

U.S.C. § 3553(b).  Mitigating factors in Palkowitsch's case which are not taken

into account by the guidelines are first, that a different officer, Officer Brian

Ficcadenti, made the initial decision to apprehend F.B. because F.B. met the

description of an armed suspect; and second, Palkowitsch's contact with F.B. at the

inception was similar to that of four other officers who responded to Officer

Ficcadenti's announcement that he had the suspect, i.e., Palkowitsch arrived to

assist with an arrest;  Palkowitsch had no prior contact with F.B. and his actions

were not motivated by guile, animus or anger with F.B.  To some extent, F.B.'s

conduct, in Palkowitsch's perception, contributed to the Palkowitsch's actions

because F.B. was an armed suspect not complying with commands.  See Section

5K2.10, U.S.S.G., victim's conduct may be consideration in sentencing.

Palkowitsch did not arrive on the scene and immediately begin kicking F.B.

He stood over F.B. and waited for Ficcadenti to take control or give directions –

which never occurred.  Palkowitsch announced to Ficcadenti that he had handcuffs

ready to put on F.B.  Palkowitsch gave F.B. commands before resorting to foot

strikes.

Giving due regard for the factors enumerated in Section 3553(a), a

probationary sentence is warranted.

(a)    <u>History and characteristics of the defendant</u> (18 U.S.C. § 3553(a)(1)

Brett Palkowitsch is 32 years old.  He grew up in Roseville, Minnesota and is one of five children.  He attended St. Bernard's High School and then St. Cloud State University.  As a young adult he set his sights on becoming a police officer. After being invited to go on a "ride along" with a St. Paul Police Officer who was a friend of the family, Brett was hooked.  Numerous friends and community members observed that Palkowitsch's long time goal of serving and protecting the community. [2] Not only did he want to become a police officer, he wanted to work for the St. Paul Police Department.  He grew up just outside the city limits and wanted to work in the community he knew and where friends and family members lived.

After working as a deputy sheriff in Carver County for approximately a year, Brett was hired by the St. Paul Police Department and began training in the department's 16 week academy in the winter of 2013.   After graduating from the St. Paul police academy, Brett sought and was placed in the Eastern Division, St. Paul's "busiest" area for police officers.  "Busy" meant lots of crime and lots of calls.  Brett was up for the challenge.  Brett was eager to learn and eager to serve.

Brett's mother and wife were at his swearing in ceremony at St. Paul Police Department. Brett's father died of massive heart attack shortly before Brett joined

---

2    References to comments of observations of others regarding Brett Palkowitsch refer to letters written to the Court on behalf of Palkowitsch.  These letters are Attachment 2 to this pleading.

the academy, missing the proud moment of seeing his son graduate from the police academy. Brett's mother Lisa was at loose ends after losing her husband so unexpectedly. Brett and his wife moved in with Brett's mother to help her stabilize her life. He also stepped up as the leader in the family. He became the go-to person for everything from advice to handy work. See letters included in Attachment 2.

Brett had one young son when he started working as a St. Paul Police Officer and another son soon followed. The boys are now 5 and 7 years old and very active in school and outside activities, especially hockey and karate. Every day Brett and his wife try to instill in their sons that they need to work hard to succeed and to serve others.

Brett is universally described as an inspirational and model neighbor. He is the quintessential caretaker, lending a hand without being asked.

Brett loved being a police officer. He was proud to be on the St. Paul police force dedicated to serving and protecting. He was passionately committed to his work. Brett's fellow officers consistently described him as competent and reliable. Like Brett's family and friends, his fellow officers knew they could count on Brett to show up and to have their back. Brett was the go-to officer for challenging cases. He was also known for showing empathy and compassion to the public. His engagement with community members and outstanding work record made him

an excellent candidate for the Payne Avenue beat assignment where he interacted

with youth in proactive policing.  Brett and his partner received high praise for

their work on the Payne Avenue beat.  See Attachment 4 (commendation from

Police Chief Axtel).

Sergeant Whittaker who hired Brett said Brett was a good "intuitive officer"

and was "proactive."  Brett engaged with victims and encouraged them to report

crimes so the police could find the offender. Brett pursued justice for victims

without regard for his personal safety.  See Whittaker letter, Attachment 2.

Brett Palkowitsch's immediate supervisor commented that, "Brett's

contribution to the police department and community was superior to most officers

on his shift."  See Murphy letter, Attachment 2.  According to Murphy,

Palkowitsch's performance evaluations were "the highest and most distinguished

on the tour." This observation is further born out by Palkowitsch's performance

evaluations found in Attachment 4.   His supervisor wrote to this Court that Brett

could be counted on to get the job done which was an underlying factor in his

selection for the critical crime suppression team in the summer of 2016.

Palkowitsch received high praise for his police work in his performance

reviews prior to and after the incident involving F.B.  See Attachment 4

(performance reviews from 2015, 2016, 2018).  In the August 30, 2018

performance review, the reviewing supervisor noted the following:

- "[Palkowitsch] is someone I can frequently approach to brainstorm with on challenging calls."

- "Officer Palkowitsch demonstrated great knowledge of our pursuit policies and took a leadership role on this call."

- "Officer Palkowitsch is a valuable officer to have working on Tour 1 in the Western District.  He is very responsible in his decision making and chooses the best court of action to take."

- [Regarding his decision not to utilize a K-9 to track down a suspect]:  "This was a great decision made by him which went in line with the newly implemented temporary K-9 policy.  He showed very good judgment in complying with this brand new temporary policy."

- "Officer Palkowitsch shows compassion and empathy on his calls.  He goes out of his way to help out people in need."

- Based on Palkowitsch's rating of 5 out of 5 in several evaluated categories:  "This kind of work shows his compassion and helps build relationships with members of the community."

- Two recent vehicle pursuits by Palkowitsch, "demonstrated his leadership abilities as a Saint Paul Police officer."

- "He is a good resource to have for a supervisor as he works well on these big calls with the rest of the tour and displays great teamwork."

- Officer Palkowitsch "did a very good job in working on this mission [reducing gun violence in the city] by taking illegal firearms off the street and arresting offenders who possessed these guns."

- "Officer Palkowitsch is a hard worker and becoming a proven leader on the street.  His communication skills in regards to report writing is top notch.  He has made some very good gun arrests during the year, working on reducing gun violence

within the city, which is a top priority for the St. Paul Police Department."

- "Officer Palkowitsch is a valuable officer and leader in the West District on Tour 1."

See August 30, 2018 Annual Performance Evaluation included in Attachment 4.

Palkowitsch scored in the "Exceeds Standards" or "Exceptional" rating on the majority of categories under evaluation.  This performance evaluation is particularly significant because it follows after his Internal Investigation and grievance proceeding involving F.B.'s arrest.  The evaluation shows that not only did Palkowitsch not engage in similar conduct, but he appreciated the seriousness of his actions and grew into an even stronger officer.

Brett Palkowitsch served with honor and pride for the St. Paul Police Department.  Brett accepted the risks of police work.  As one writer has stated, "Without fear, there cannot be courage." Christopher Paolini, American author. Police officers must face the fear and find the courage to do their work each and every shift.  Brett, like other patrol officers, did not ignore the risks of his work on the streets.  Brett feared for himself and his fellow officers, but he accepted the risks of the job.  He made many, many arrests and took many violent offenders off the streets of St. Paul. But like the well-trained officer he was, Brett found courage by facing his fear and being well prepared.  He always tried to act in accordance with his training. He was conscientious and he strove to do his best.  We all try; we all fail at times.  According to the jury, on June 24, 2016, Brett failed.  Even in the

situation which gave rise to his conviction, Brett believed he was acting in a way that was supportive of the canine officer who initiated the arrest of F.B.  He felt he acted in good faith.  See Brett Palkowitsch's letter to the Court included in Attachment 2.

Brett's six dedicated years of service on the St. Paul Police force and his numerous professional acts and good deeds as an officer, should not be overlooked in deciding the appropriate consequence for the conviction.

(b)    <u>Nature and circumstances of the offense</u> 18 U.S.C. § 3553(a)(1)

The nature and circumstances of the offense must include consideration of the actions that preceded Officer Palkowitsch's involvement in the arrest of F.B. Palkowitsch did not initiate the police contact with Baker.  By the time Palkowitsch arrived on the scene, a police canine was fully engaged on Baker and the canine handler was not releasing the canine from the suspect.  The incident that unveiled on June 24, 2016 is far different from circumstances where police officers have been found to use excessive force on a suspect who is fully compliant or fully restrained or officers who use force gratuitously or in retaliation for the arrestee's actions. *See e.gs. United States v. Dautovic,* 763 F.3d 927 (8th Cir. 2014); *United States v. Boone*, 828 F.3d. 705 (8th Cir. 2016); *United States v. Dukes*, 779 Fed Appx. 332 (6th Cir. 2018); *United States v. Brown*, 654 Fed. App. 896 (10th Cir. 2016).

While the jury found that Officer Palkowitsch's force deprived F.B. of his

constitutional rights to be free from excessive force, Palkowitsch's initial involvement in assisting Officer Ficcadenti with Baker's arrest mitigates in Palkowitsch's favor for leniency.  Officer Palkowitsch saw a man, matching the description of an armed suspect that had been given by dispatch and he was being apprehended by a canine.  The canine's hold on the suspect was exceptionally long – in fact three times longer than a typical canine engagement according to a canine instruction.  And the situation was not resolving.  Officer Palkowitsch used a tool readily at his disposal to assist in the apprehension.  Officer Palkowitsch used foot strikes, or kicks, to gain the suspect's compliance.

Although F.B. did not have a weapon on him, that fact was not known to the officers until F.B. was ultimately handcuffed.  While the Government has argued that F.B. was reaching toward the pain in his leg when he was writhing and sitting up, contrary to police commands, F.B.'s actions can also be interpreted as being non-compliant with the commands being given to him.  Indeed, the arbitrator who heard evidence of F.B.'s apprehension found, that Palkowitsch "faced a tense, uncertain and rapidly evolving situation involving an uncooperative individual, whom he believed had a firearm, as stated by dispatch."  Grievance Arbitration award April 3, 2017 at page 24 (Attachment 1).  Additionally, officers on the scene who wrote reports regarding the incident, reported that F.B. was not complying.  This included Officers Ficcadenti (Defendant's Exhibit D-1); Dick (Defendant's Exhibit D-2); and Nowicki (Defendant's Exhibit D-5).  See Attachment 7.

Officer Palkowitsch was not the only St. Paul police officer to ever use foot strikes in an apprehension.  In letters to the court, Palkowitsch's classmates noted that they were taught to use kicks.  Other officers attest to the fact that they used kicks, one officer noting that he had been involved in approximately twenty instances where kicks were used on suspects.  At least one officer was commended for his use of kicks during an apprehension.  Other officers received minor discipline when kicks were found to be excessive.  See examples cited in Attachment 3.

Regrettably the consequence of Palkowitsch's kicks were serious injuries to F.B.  But Palkowitsch's actions on one occasion should not wipe out entirely the years of honorable service he gave to the St. Paul Police Department.  As one officer noted, Palkowitsch was a "reliable officer and trusted guardian."

Brett Palkowitsch lost his dream job as a result of his actions June 24, 2016. Since that date he carried out his duties as a police officer for another 24 months (June 24 to November 2, 2016 and April 2017 until January 2019).  In total, Palkowitsch served as a St. Paul Police Officer five years with a stellar record with the exception of his conduct on June 24, 2016.

(c)    The need for the sentence imposed 18 U.S.C. § 3553(a)(2)

In deciding the needed for a particular sentence, the Court is directed to look at the need:

(A)    To reflect the seriousness of the offense, to promote respect for

23

the law, and to provide just punishment for the offense;

(B)     To afford adequate deterrence to criminal conduct;

(C)     To protect the public from further crimes of the defendant; and

(D)     To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

18 U.S.C. § 3553(a)(2)(A) – (D).

Palkowitsch has been seriously punished already for his offense conduct. The past four years have been a roller coaster filled with anxiety, uncertainty, unemployment, re-employment and ultimately his felony conviction. His conviction in this court has resulted in the loss of his dream career as a police officer. He has paid a high price for his crime of conviction.

Not only will Palkowitsch not be able to serve as a licensed peace officer but his future employment opportunities will be limited by his felony conviction. Collateral consequences of a conviction may be considered by the court in determining a fair sentence. *See United States v. Pauley*, 511 F.3d 468, 474-74 (4th Cir. 2007); *United States v. Nesbeth*, 188 F.Supp.3d 179, 180 (E.D.N.Y. 2016).

The fact that Palkowitsch can no longer serve as a law enforcement officer means that there is no future danger to suspects or arrestees of excessive force being used by Palkowitsch. Palkowitsch's otherwise clean record suggests that incarceration is not necessary to deter him from future criminal conduct.

Prison for Palkowitsch, a former law enforcement officer, renders

incarceration more severe for him than others facing incarceration.  By comparison, the guideline range recommended by the probation officer is the same range applied for voluntary manslaughter.  *See* Section 2A1.3, U.S.S.G.  Additionally, that same guideline range, 87 to 108 months, is <u>greater</u> than the range applicable to a drug dealer held responsible for between 700 grams and one kilogram of heroin, for example, or a drug dealer responsible for between 3.5 kilograms and 5 kilograms of cocaine.  See Section 2D.1.(6), U.S.S.G.  A drug dealer's conduct may span several months or years to trigger a level 28 base offense level on the sentencing guideline grid. On the other hand, the recommended offense level for Palkowitsch starts at level 29 and his offense occurred in one minute out of five years of commendable service to a police force.  For an otherwise law abiding police officer to be sentenced in a similar range as a person who commits a homicide or a drug dealer is excessive.

Aberrant behavior is grounds for consideration for departure or a variance. See Section 5K2.20, U.S.S.G.  A departure or variance is warranted "if the defendant committed a single criminal occurrence or a single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life."  Offense conduct that spanned less than a minute is a stark aberration from Palkowitsch's otherwise law-abiding life and commendable service to the St.

Paul Police Department

The deterrent value of punishment is tied to the promptness with which the punishment is inflicted. *Coleman v. Balkcom*, 451 U.S. 949, 952 (1981) (Stevens, J., concurring in denial of cert.). The offense in this case occurred nearly four years ago. Since the date of offense, Palkowitsch worked another 24 months for the St. Paul Police Department without a similar incident. He was terminated four and one-half months after the date of offense, then re-instated approximately ten months later and served 20 months (May 2017 – December 2018) before the indictment in this case was filed in January 2019. Notably he received an exceptional performance review in 2018. See Attachment 4.

Palkowitsch is not in need to educational or vocational training, medical care of other treatment available in a correctional institute. 18 U.S.C. § 3553(a)(2)(d). The need to reflect the seriousness of the offense and all deterrent policies can be served by a probationary sentence.

(d)   <u>The kinds of sentences available</u>. 18 U.S.C. § 3553(a)(5)

Given the advisory nature of the guidelines, a wide range of sentencing options are available to this Court. The Court is not to presume that a guideline sentence is reasonable. *See Rita v. United States*, 551 U.S, 338, 347 (2007).

Palkowitsch seeks a probationary sentence. A probationary sentence imposes restrictions on liberty. As the Supreme Court noted in *United States v.*

*Gall*, 552 U.S. 85 (2007), "[o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." *Id.* at 101. A probationary sentence may include monitoring through home detention, GPS monitoring as well community service requirements.  The Court has the opportunity to use Palkowitsch as an instrument for restorative justice and contributions to the community he failed.

  e. <u>The need to avoid unwarranted sentencing disparities among defendants who have been found guilty of similar conduct.</u>  18 U.S.C. § 3553(a)(6)

Section 3553(a)(6) directs that the sentencing courts need to avoid unwarranted disparities among defendants convicted of similar conduct.  A review of law enforcement officers in a similar situation as Officer Palkowitsch is appropriate, not just those who stand convicted.  Many, many officers whose actions resulted in injuries never faced state or federal charges, despite civil settlements with the civilian.  Many, many officers who were convicted of similar offenses did not obtain sentences within the range of penalties found in the federal sentencing guidelines, and finally the sentences imposed on other law enforcement officers did not remotely approximate the advisory range recommended by the probation office in this case.

  A.  Uncharged law enforcement officers.

  First and foremost, this Court should consider the disparate treatment of

Brett Palkowitsch and Officer Brian Ficcadenti to whom the Government granted immunity.

Canine Officer Brian Ficcadenti received a "pass" from the Government. After he was assured immunity from the Department of Justice, Brian Ficcadenti asserted his Fifth Amendment privilege. The District Court then Ordered Ficcadenti's testimony. Government's Trial Exhibit 12. Ficcadenti had been the target of the FBI's investigation into F.B.'s arrest for approximately six months before he was offered immunity. Given Ficcadenti's admitted mishandling of his canine on June 24, 2016, he very likely would have been convicted but for the immunity granted to him from prosecution.

In a case that paralleled Ficcadenti's actions, a Maryland canine officer, Stephanie Mohr, was sentenced to 120 months for violating 18 U.S.C. § 242. Mohr unreasonably released her canine on a suspect without giving commands and the suspect's hands were in the air (a fact she disputed). *See United States v. Mohr,* 318 F.3d 613, 617 (4th Cir. 2003).

Brian Ficcadenti escaped a conviction and a fate similar to Officer Mohr. Ficcadenti's testimony supported the conclusion that he unreasonably released his canine on F.B. Ficcadenti is singularly responsible for initiating F.B.'s detention on June 24, 2016 with the use of his canine partner Falco who Ficcadenti failed to control. Two other St. Paul Police Officers saw F.B. sitting in a car in the area

near where a black male with dreadlocks, wearing a white t-shirt was reported to be wielding a gun.  Officer Joe Dick and Officer Tony Spencer found no reason to even approach the occupant of the car and ask him any questions.  But when Brian Ficcadenti drove down the same alley moments later, Officer Ficcadenti made the decision to order the black male out of the vehicle with his hands in the air.  The Government appears to be inconsistent in its view that Dick and Spencer were justified in not stopping to talk to F.B. who matched the description of the armed suspect and its view that Ficcadenti was justified in ordering F.B. out of his car and then releasing his unleashed canine on F.B.

When F.B. got out of his car, according to Ficcadenti, F.B did not follow commands, F.B. hesitated outside the car, looked around as if he was thinking of fleeing and did <u>not</u> put both of his hands up in the air at the same time.  Ficcadenti Transcript at pp 52-53.[3]  Ficcadenti then released his canine partner off leash onto F.B.  Ficcadenti had no control over his dog who grabbed F.B.'s leg and pulled him around in the parking lot where the apprehension occurred.  Ficcadenti unleashed his canine without giving F.B. a warning, did not control his canine, did not direct other officers on the scene which resulted in serious permanent injuries to F.B.'s leg.  The injuries to F.B.'s leg met the definition of "serious bodily

---

3       F.B. testified at trial that he complied with the officer's commands, got out of his car and put both hands behind his head.

injury." *See* Section 1B1.1, Application Note 1(L).  No prosecution for Ficcadenti and years in prison for Palkowitsch is an outcome that would serve a gross injustice.

In another highly publicized Minnesota incident captured on YouTube, two St. Paul Policers, Zilge and Gorans, were seen spraying a suspect with mace multiple times, kicking him and slamming his head on the squad car after he was restrained in August 2012 arrest. The officers were not prosecuted.  See Attachment 8.

B.     Similarly situated officer in state court proceedings

In a case similar to this one, Minneapolis Police Officer Christopher Reiter was prosecuted for using excessive force May 30, 2016 in state court.   Officer Reiter was charged with third degree assault after he used deadly force on a suspect.  Specifically, Officer Reiter kicked a suspect in the head while the suspect was on the ground which resulted in substantial bodily harm.[4]  Officer Reiter's actions occurred a mere three weeks before Office Palkowitsch's actions. Officer Christopher Reiter was placed on probation and order to serve 180 days in community confinement.  See Attachment 5 (Complaint and Register of Actions in

---

[4]     Substantial bodily harm is defined under Minnesota law as "bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily member or organ, or which causes a fracture of any bodily member."  Minn. Stat. § 609.02 subd. 7a.8

Hennepin County Case No. 27-CR-17-6475). Officer Reiter used deadly force and was prosecuted in state court; Officer Palkowitsch was prosecuted in federal court. The injuries caused by both officers were temporary but substantial losses or impairment of the function of a bodily member or organ.  In Officer Palkowitsch's case, the loss and impairment was to F.B.'s lungs.  Community based confinement for one officer of four months (given good time credit of one third[5]) verses years in prison which the Government is seeking for Palkowitsch, creates a wildly disparate treatment of similarly situated police officers.

Another Minnesota police officer, David Clifford, was convicted of first degree assault in violation of Minnesota Statute Section 609.221, and received a sentence of 43 months, which meant he would serve 28 months or two-third of the sentence.  See Minn. Stat. § 244.101, subd. 1.  Officer Clifford caused "great bodily harm" which is bodily injury that creates a high probably of death or which causes serious permanent disfigurement.  See Minn. Stat. § 609.02, subd. 8.  Clifford, who was off-duty, punched a bar patrol who fell backwards, cracked his head and required three brain surgeries following the assault.  *See State v. Clifford*, Anoka County Case No. 02-CR-12-4361, Attachment 6 (Complaint, news release and Register of Actions).

C.      Similarly situated officers in federal prosecutions

---

5        See Minn. Stat. § 244.101 subd. 1.

A comparison of officers convicted of similar offenses warrants consideration by this Court.

In *United States v George*, 18-CR-23 W.D.N.C (2019), the sentencing court placed George, a North Carolina police sergeant convicted of using excessive force, on probation for 4 years after finding that the advisory guideline range to be 27 to 33 months.[6] George, a sergeant in the Hickory Police Department in North Carolina, assaulted a woman whom he had arrested and handcuffed. When George arrived at the police department with the suspect, he dragged her out of the squad car from the back seat and slammed her down face first onto the driveway while her hands were still cuffed behind her back. The woman was later taken to the hospital and diagnosed with a broken nose, dental injuries and lacerations to her knee and chin. See Ecf # 50 in *United States v. George,* (Government's Response to Defendant's Sentencing Memorandum).

In *United States v. Proano*, 16-CR-590 N.D. Illinois (conviction affirmed 912 F.3d 431 (7th Cir. 2019)), Proano was sentenced to two concurrent 60-month sentences after being found guilty of two counts of violation of 18 U.S.C. Section 242. Proano, a Chicago police officer, used deadly force when he shot 16 times into a vehicle occupied by six teenagers and two occupants sustained gunshot

---

6       The Government filed a Notice of Appeal and George filed a Notice of Cross Appeal. See ecf # 56 and ecf # 60 in *United States v. George*, D. W.D.N.C. 18-Cr-23.

wounds. A doctor testified that both teens could easily have been killed.  The

guideline sentence range for Proano was 121 to 151 months in prison. The

sentence imposed on Proano reflected a 50% downward variance from the advisory

guidelines.

In *United States v. Rodella*, 804 F.3d 1317 (10th Cir. 2015), Sheriff Rodella

entered the passenger side of a citizen's vehicle with a firearm in his hand after

becoming annoyed with a driver who "flipped" him off on the roadway.  Not only

did the deputy display his firearm, he also pulled the driver from the vehicle,

slammed him face down on the ground and "stuff[ed]" his badge into the driver's

eye after he was asked to prove he was a law enforcement officer.  *Id.* at 1322.

Rodella received a 37 month sentence for excessive force and a consecutive 7 year

sentence for violation of 18 United States Code Section 924 (c)(1) (use of firearm

in furtherance of crime).

In *United States v. Smith,* 14-CR-0006, S.D. Indiana (2014) Smith, a deputy

sheriff, received a sentence of 33 months.  Smith was convicted of using excessive

force in effecting the detention and arrest of two different individuals.  On one

occasion, after a suspect was detained and controlled by two other deputies, Smith

punched the victim in the face with a closed fist.  On another occasion, after a

suspect was escorted to a police vehicle while handcuffed behind his back, Smith

slammed him into the back of a police vehicle, threw him to the ground, jumped on

33

top of the suspect and kneed him in the back.  Smith had a history of other assaults

showing a pattern of violent behavior as a law enforcement officer and as a

civilian.

In *United States v. Dukes,* 17-CR-10, W. D. Kentucky, (affirmed 779 Fed.

App'x 332 (6th Cir. 2018)*,* a police officer was given a 42 month sentence.  After

conducting a traffic stop, for which no citation was issued, the officer pulled a man

out of his car, hit the man in the genitals and after learning that the man had a bad

back, hit him in the back.  The man who had been the subject of the bogus traffic

stop called the police department to lodge a complaint against the officer.  The

officer who had made the traffic stop, Officer Dukes, answered the phone much to

the caller's chagrin.  Having received no satisfaction after his first call, the man

called a few hours later and again the call was answered by Officer Dukes!  Dukes,

aware that a citizen was intent about filing a complaint against him, went to the

man's home, entered without a warrant, shot the man with a taser, hit him with a

baton multiple times, punched him in the nose, breaking the victim's nose causing

a fracture, and sprayed his face with pepper spray.   Dukes was found to have

entered the caller's home illegally without a warrant and without probable cause.

In *United States v. Dautovic*, 11-CR-159, S.D. Iowa (2011), an off-duty

police officer made a traffic stop, sprayed the backset passenger with mace and hit

him with an ASP baton in the back of the head.  The suspect blacked out and fell.

He was repeatedly hit with an ASP baton after he fell to the ground and was lying in a fetal position. The suspect suffered a broken hand, a head wound that required stitches, numerous welts and bruises from the baton strikes. Dautovic's advisory guideline range was 135 – 168 months; he was sentenced to 20 months in prison. The Eighth Circuit reversed Dautovic's sentence and remanded for re-sentencing. *United States v. Dautovic,* 763 F.3d 927 (8th Cir. 2014). Dautovic died before re-sentencing could occur. See 11-CR-159, ecf # 168.

In *United States v. Boone*, 13-CR-139, S.D. Iowa (conviction affirmed at 828 F.3d 705 (8th Cir. 2016)), Boone approached a suspect whom other officers were trying to handcuff. Boone, who weighed 400 pounds at the time, delivered kicks directly to the suspect's face, a form of deadly force, causing the suspect's head to jerk back in a whiplash motion and knocking out two teeth. 828 F.3d at 708. Boone was sentenced to 63 months in prison. 828 F.3d at 711.

In *United States v. Watson*, 15-CR-243, N. D. Alabama, Deputy Sheriff Branscum, sought out a man who had engaged in a bar fight with him while the deputy was off-duty. Several days after the bar fight, the deputy found the man, conducted a traffic stop, punched the man in the face, hit him several times with a baton and then choked him from behind until he lost consciousness. When other deputies arrived, the suspect was unconscious and did not appear to be breathing. The deputy received a 36-month sentence.

In *United States v. Livoti,* 196 F.3d 322 (2d Cir. 1999), New York City Police Officer Livoti put a young man in a chokehold who was protesting the arrest of his brother (and the brother's only misdeed had been to continue passing the football after being cursed at by Livoti and told to go home).  The chokehold on the bystander brother lasted approximately one minute and left the young man unconscious.  The man died at the hospital.  Officer Livoti received a sentence of 90 months.  196 F.3d at 325.

Palkowitsch's case is less serious than Officer Reiter's case.  Reiter used deadly force to gratuitously kick a suspect in the face.  He was sentenced to six months.

Palkowitsch's case is less serious that that of Anoka Police Officer Clifford who assaulted a suspect and caused greater harm than Palkowitsch caused to F.B.

Palkowitsch's case is less serious than that of police sergeant George who gratuitously assaulted a woman after she was handcuffed causing her a broken nose, dental injuries and lacerations.  George was sentenced to four years of probation.

Palkowitsch's case is less serious than that of Proano who used deadly force and shot into a vehicle occupied by six teenagers.  Proano received a sentence of 60 months.

Palkowitsch's case is less serious that that of Rodella who acted gratuitously

and in retaliation when a driver gave him an obscene gesture.  Rodella received a

37month sentence for excessive force (and a consecutive sentence for use of a

firearm).

Palkowitsch's case is less serious than that of Deputy Smith who committed

multiple acts of excessive force and had a history of assaultive behavior as a police

officer and as a civilian.  Smith received a 33 month sentence.

Palkowitsch's case is less serious than that of Dukes who entered a citizen's

residence illegally and used excessive force in retaliation for the citizen attempting

to file a complaint against Dukes.  Dukes received a sentence of 42 months

Palkowitsch's case is less serious than that of Dautovic who repeatedly it a

suspect after he was on the ground and in a fetal position causing the suspect a

broken hand and head wound, inter alia.  Dautovic received a 20 month sentence

(which the Eighth Circuit found too lenient).

Palkowitsch's case is less serious than that of 400 pound Boone who took a

running start and kicked a citizen in the head. Boone received a 63 month sentence.

Palkowitsch's case is less serious that that of Watson who acted in

retaliation against a man with whom he had a fight days earlier when Watson was

off duty.  Watson gratuitously beat the man until he lost consciousness.  Watson

received a 36 month sentence.

Palkowitsch's case is less serious than that of Livoti whose victim died as a

result of Livoti's chokehold. Livoti received a 90 month sentence.

Palkowitsch's case stands out from the other cases involving violation of Title 18 United States Codes Section 242. Palkowitsch's conduct was isolated, an aberration, occurred in a short span of time, was the result of an erroneous split-second decision made in a chaotic evolving apprehension in progress which he did not initiate. Moreover, Palkowitsch's outstanding performance for the St. Paul Police Department is a significant factor that outweighs what was found to be a criminal act.

A sentence within the guideline range found and advocated by the Government, i.e., 87-108 months, would result in a gross sentencing disparity of law enforcement officers similarly convicted. On balance, in view of all the factors enumerated n Section 3553(a), a probationary sentence is sufficient but not greater that needed to meet the sentencing goals and policies enacted by Congress.

## CONCLUSION

In sum, a sentence of incarceration would be extreme, excessive and disproportionate to Brett Palkowitsch's crime. The toll upon Palkowitsch in the past four years, from the stress of losing his job twice, working diligently as a police officer on and off between termination and re-hiring, permanently losing his dream job and career in law enforcement, has served as strong punishment. Palkowitsch presents no public safety risks, he is unlikely to re-offend and his

conviction alone will have a strong impact on law enforcement members in the community.  Consequences to the law enforcement community that go beyond deterrence, such as chilling the desire to work in the field or to engage in situations requiring split second decision making, will work a disservice to the statutory sentencing goals.

A probationary sentence will serve this Court's mandate to impose a sentence that is sufficient, but not greater than necessary, to comply with the purposes of Section 3553(a).

Finally, if this Court should order any incarceration time, the defendant respectfully requests a voluntary surrender to the designated institution. Palkowitsch has been law abiding in the nearly four years since the incident giving rise to his conviction;  he has been on release status since the Indictment was returned in January 2019;  he presents a safety risk if incarcerated at the Sherburne County Jail pending designation; and voluntary surrender has been regularly used in other cases where law enforcement officials have been convicted.  *See egs. United States v. Rehak and Naylon,* D. Minn. 08-CR-72 (PJS/SNR) ecf, # 133 and ecf # 134;[7]  *Proano, supra*  at 16-CR-590 (N.D. Ill. E.Div) ecf # 167; *United States*

---

7       In the Judgment In A Criminal Case for both defendants Rehak and Naylon, the Honorable Patrick J. Schiltz, made the following recommendation to the Bureau of Prisons:  "That the defendant be incarcerated at the Federal Prison Camp in Duluth or at anther facility where the defendant will be safe from inmates who might want to harm him."  Ecf # 133 and ecf # 134 in D. Minn. 08-CR-72.  If ordered to a term of

*v. Corder,* 15-CR-141 (W.D. Ky) ecf #71; *Watson*, *supra* at 15-CR-243 (N.D.

Ala) ecf # 59; *Smith, supra* at 14-CR-00006 (S.D. Ind.) ecf. # 170; *Webb*, *supra*

at 98-CR 256 (S.D. Ark) ecf #62; *Dukes, supra* at 17-CR-10 (W.D.Ky) ecf # 77;

*United States v. Cozzi*, 08-CR-276 (N.D. Illinois) ecf #76.


Dated: February 26, 2020                    Respectfully submitted,

                                            */s/ deborah ellis*
                                            DEBORAH ELLIS
                                            Attorney Lic. No. 14616X
                                            101 East Fifth Street, Suite 1500
                                            Saint Paul, MN 55101
                                            651-288-3554
                                            Email: *deborahellis2626@gmail.com*

---

imprisonment, Palkowitsch seeks the same language in the Judgment.

## INDEX TO ATTACHMENTS

Attachment 1          Grievance Arbitration and Award
                      April 3, 2017

Attachment 2          Letters to the Court from Brett Palkowitsch, Family and
                      Community Members (arranged alphabetically)

Attachment 3          St. Paul Officers Using Foot including
                      Commendation to Smith & Titus

Attachment 4          Brett Palkowitsch's Performance Reviews for 2015, 2016
                      & 2018 and 18 Letters of Commendation

Attachment 5          Complaint, News Release and Register of Actions in
                      *State v. Reiter*; Hennepin County District Court File No.:
                      27-CR-17-6475

Attachment 6          News Release, Complaint and Register of Actions in
                      *State v. Clifford*, Anoka County File No. 02-CR-12-4361

Attachment 7          Incident Reports of Officers Ficcadenti, Dick & Nowicki

Attachment 8          Chao Xiong, Minneapolis Star & Tribune, *St. Paul cops
                      won't face charges in arrest seen on YouTube*, Nov. 30,
                      2012.   Eric Hightower Incident.